No. 24-60209

# In the United States Court of Appeals For the Fifth Circuit

**TEXAS CORN PRODUCERS; TEXAS SORGHUM PRODUCERS; NATIONAL SORGHUM PRODUCERS; TEXAS FOOD & FUEL ASSOCIATION,**
*Petitioners,*

**v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN,** *in his official capacity as the Administrator of the United States Environmental Protection Agency,*
*Respondents.*

On Petition for Review of a Rule of the
U.S. Environmental Protection Agency

## OPENING BRIEF FOR PETITIONERS

Michael Buschbacher
R. Trent McCotter
James R. Conde
  *Counsel of Record*
Laura B. Ruppalt
BOYDEN GRAY PLLC
801 17th Street NW., Suite 350
Washington, DC 20006
(646) 266-4011
jconde@boydengray.com
*Counsel for Petitioners*

# CERTIFICATE OF INTERESTED PERSONS

## *Texas Corn Producers, et. al. v. United States Environmental Protection Agency, et al.*
No. 24-60209

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the judges of this Court may evaluate possible disqualification or recusal.

Petitioner Texas Corn Producers is a non-profit agricultural organization. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in it.

Petitioner Texas Sorghum Producers is a non-profit agricultural organization. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in it.

Petitioner National Sorghum Producers is a non-profit agricultural organization. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in it.

Texas Food & Fuel Association is a non-profit trade association representing the retail and wholesale sectors of the oil and gas industry

in Texas. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in it.

The United States Environmental Protection Agency is an agency of the United States.

Michael S. Regan is the Administrator of the United States Environmental Protection Agency.

Michael Buschbacher, R. Trent McCotter, James R. Conde, and Laura B. Ruppalt of Boyden Gray PLLC—*Counsel for Petitioners.*

Albert Lin—*Counsel for Respondents.*

August 16, 2024                    Respectfully submitted,

                                   /s/ James R. Conde
                                   BOYDEN GRAY PLLC
                                   801 17th Street NW., Suite 350
                                   Washington, DC 20006
                                   (202) 955-0620

## REQUEST FOR ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a) and (f) and Fifth Circuit Rule 28.2.3, Petitioners respectfully request oral argument. This case involves important issues of administrative law as well as a complex technical record. Oral argument would aid the Court in its resolution of the case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................i

REQUEST FOR ORAL ARGUMENT....................................................iii

TABLE OF CONTENTS ....................................................................iv

TABLE OF AUTHORITIES................................................................vi

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF THE ISSUE ...............................................................1

INTRODUCTION................................................................................3

STATEMENT OF THE CASE ...............................................................7

    I.    Statutory and Regulatory Background ..................................7

        A.    The Corporate Average Fuel Economy Program...........7

        B.    The Gas Guzzler Tax ......................................................9

        C.    EPA's Role in Automobile Fuel Economy Testing.........9

        D.    EPA's Fuel Economy Test Procedures........................11

        E.    The Prior Test Fuel Adjustment...................................13

        F.    The New "E10" Test Fuel...............................................19

    II.    The Proposed Adjustment for E10........................................20

        A.    The EPA Test Program................................................20

        B.    The 2020 Proposed Rule ..............................................22

    III.    The Comments ....................................................................23

A. Comments Explain the Flaws in the Test Program's Design ......................................................... 24

B. Comments Explain the Flaws in EPA's Data Analysis ....................................................... 26

C. Comments Offer Better Alternative Data ................... 28

IV. EPA Ignores Comments and Promulgates the Final Rule ... 29

SUMMARY OF THE ARGUMENT ......................................... 31

ARGUMENT .................................................................. 31

I. Petitioners Have Standing ....................................... 31

II. EPA's $R_a$ Sensitivity Factor of 0.81 Is Arbitrary ................. 39

A. EPA Arbitrarily Ignored Serious Flaws in the Test Program's Design ................................................. 41

B. EPA Arbitrarily Excluded and Included Data ............ 50

C. EPA Arbitrarily Rejected Alternatives Without Adequate Explanation ................................................. 57

III. Vacatur Is the Proper Remedy ............................... 63

CONCLUSION .............................................................. 64

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*10 Ring Precision, Inc. v. Jones,*
    722 F.3d 711 (5th Cir. 2013) ...................................................... 57, 63

*Appalachian Power Co. v. EPA,*
    249 F.3d 1032 (D.C. Cir. 2001) ................................................... 40, 46

*Business Roundtable v. SEC,*
    647 F.3d 1144 (D.C. Cir. 2011) ......................................................... 46

*Carpenters Indus. Council v. Zinke,*
    854 F.3d 1 (D.C. Cir. 2017) ....................................................... 35, 36

*Chamber of Commerce of the United States v. SEC,*
    85 F.4th 760 (5th Cir. 2023) .............................................................. 60

*Clarke v. Commodity Futures Trading Comm'n,*
    74 F.4th 627 (5th Cir. 2023) ............................................................. 41

*Clinton v. City of New York,*
    524 U.S. 417 (1998) ........................................................................ 35

*Competitive Enter. Inst. v. NHTSA,*
    901 F.2d 107 (D.C. Cir. 1990) ......................................................... 39

*Contender Farms, L.L.P. v. USDA,*
    779 F.3d 258 (5th Cir. 2015) ........................................................... 37

*Consumers' Rsch. v. FCC,*
    2024 WL 3517592 (5th Cir. July 24, 2024) ...................................... 11

*Corrosion Proof Fittings v. EPA,*
    947 F.2d 1201 (5th Cir. 1991) .......................................................... 63

*Ctr. for Auto Safety v. NHTSA,*
    793 F.2d 1322 (D.C. Cir. 1986). .................................................. 8, 38

*Ctr. for Auto Safety v. Thomas*,
  847 F.2d 843 (D.C. Cir.) ........................................................ 11

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ............................................................... 3

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019) ............................................................. 32

*Dep't of Educ. v. Brown*,
  600 U.S. 551 (2023) ............................................................. 37

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ....................................................... 40, 45

*Energy Future Coal. v. EPA*,
  793 F.3d 141 (D.C. Cir. 2015) ........................................ 37, 38

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ............................................................. 50

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ............................................................. 39

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC),*
  *Inc.*, 528 U.S. 167 (2000) ................................................... 33

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ............................................................. 38

*Kisor v. Wilkie*,
  588 U.S. 558 (2019) ............................................................... 3

*Louisiana v. Dep't of Energy*,
  90 F.4th 461 (5th Cir. 2024) .............................................. 36

*Lujan v. Def. of Wildlife*,
  504 U.S. 555 (1992) ............................................................. 38

*Mexican Gulf Fishing Co. v. Dep't of Commerce*,
  60 F.4th 956 (5th Cir. 2023) ...................... 39, 41, 46, 50, 64

*Michigan v. EPA*,
    576 U.S. 743 (2015) ............................................................................... 39

*Mississippi v. EPA*,
    744 F.3d 1334 (D.C. Cir. 2013) ......................................................... 55

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*
    *Auto. Ins. Co.*, 463 U.S. 29 (1983) ......................................... 40, 56, 57

*Nat. Res. Def. Council v. NHTSA*,
    894 F.3d 95 (2d Cir. 2018) ............................................................... 8, 33

*Nat'l Shooting Sports Found., Inc. v. Jones*,
    716 F.3d 200 (D.C. Cir. 2013) ............................................................ 57

*Ohio v. EPA*,
    144 S. Ct. 2040 (2024) ............................................................. 3, 40, 56

*R.J. Reynolds Vapor Co. v. FDA*,
    65 F.4th 182 (5th Cir. 2023) ............................................................... 45

*Standing Rock Sioux Tribe v. U. S. Army Corps of Engineers*,
    985 F.3d 1032 (D.C. Cir. 2021) .......................................................... 63

*Students for Fair Admissions, Inc. v. Univ. of Texas at*
    *Austin*, 37 F.4th 1078 (5th Cir. 2022) .......................................... 31, 38

*Texas v. Biden*,
    10 F.4th 538 (5th Cir. 2021) ............................................ 44, 45, 50, 63

*Texas v. EEOC*,
    933 F.3d 433 (5th Cir. 2019) .............................................................. 32

*Tex. Ass'n of Mfrs. v. Consumer Prod. Safety Comm'n*,
    989 F.3d 368 (5th Cir. 2021) .............................................................. 37

*Tex. Democratic Party v. Benkiser*,
    459 F.3d 582 (5th Cir. 2006) .................................................. 32, 35, 37

*Tex. Entm't Ass'n, Inc. v. Hegar*,
    10 F.4th 495 (5th Cir. 2021) .......................................................... 38, 63

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
  985 F.3d 472 (5th Cir. 2021) ............................................. 39

*United Techs. Corp. v. Dep't of Defense*,
  601 F.3d 557 (D.C. Cir. 2010) ........................................... 44

*Young Conservatives of Tex. Found. v. Smatresk*,
  73 F.4th 304 (5th Cir. 2023) ...................................... 32, 37

**Statutes**

5 U.S.C. § 702 ......................................................................... 39

5 U.S.C. § 706 ......................................................................... 39

26 U.S.C. § 4064(a) .............................................................. 9, 33

26 U.S.C. § 4064(c) ........................................ 1, 4, 10, 11, 13, 17

42 U.S.C. § 6201 ....................................................................... 7

49 U.S.C. § 32901(a) ........................................................ 7, 26, 43

49 U.S.C. § 32902(a) ............................................................... 7, 8

49 U.S.C. § 32902(b) .................................................................. 7

49 U.S.C. § 32902(f) .................................................................. 8

49 U.S.C. § 32902(k) ................................................................ 43

49 U.S.C. § 32903(a), (c) ............................................................ 8

49 U.S.C. § 32904(a) .................................................. 1, 7, 8, 9, 10

49 U.S.C. § 32904(c) ........................................................ *passim*

49 U.S.C. § 32909(a) ............................................................. 1, 38

49 U.S.C. § 32911(b) .................................................................. 8

49 U.S.C. § 32912(b) ................................................................ 33

## Regulations

40 C.F.R. § 86.113-04 ................................................................ 19

40 C.F.R. § 600.101 ................................................................ 12

40 C.F.R. § 600.113-12 ................................................ 1, 15, 64

40 C.F.R. Part 600, App'x II ........................................ 13, 15

40 C.F.R. § 1065.710 .................................................. 13, 19, 44

40 C.F.R. § 1066.210 ................................................................ 12

42 C.F.R. § 86.1816-18 ............................................................ 43

49 C.F.R. § 1.95 ...................................................................... 7

49 C.F.R. § 531.6 .................................................................... 8

49 C.F.R. § 578.6 .............................................................. 8, 33

49 C.F.R. Part 531 .................................................................. 8

## Federal Register

41 Fed. Reg. 38,674 (Sept. 10, 1976) ...................................... 13

49 Fed. Reg. 48,024 (Dec. 7, 1984) ........................................ 14

50 Fed. Reg. 27,172 (July 1, 1985) .............................. 15, 33, 57

51 Fed. Reg. 37,844 (Oct. 24, 1986) ................................ 15, 18

79 Fed. Reg. 23,414 (Apr. 28, 2014) ................ 19, 20, 46, 47, 58, 59

86 Fed. Reg. 43,583 (Aug. 10, 2021) ........................................ 4

89 Fed. Reg. 27,842 (Apr. 18, 2024) ........................................ 1

89 Fed. Reg. 52,540 (June 24, 2024) ...................................... 33

**Other Authorities**

DOE, *How Vehicles Are Tested*, https://tinyurl.com/4yyk38x4 .............. 12

DOE, Fact of the Week #1353, https://perma.cc/32GN-SE94 ............... 44

EPA, The 2023 EPA Automotive Trends Report,
    https://perma.cc/9XPH-6YLB ............................................................. 59

EPA, Response to Comments, EPA-420-R-14-004, (Feb.
    2014), https://perma.cc/3AA5-MYWK .................. 20, 21, 25, 46, 48, 58

EPA Guidance Letter CD-95-09 (June 1, 1995),
    https://tinyurl.com/4s26ytww ................................................. 24, 43, 45

EPA Guidance Letter, VPCD-97-01 (Jan. 24, 1997),
    https://tinyurl.com/4wt263sj ......................................................... 51, 52

EPA, *2016 Silverado 2500 Certificate of Conformity*,
    https://tinyurl.com/2kd74xfp ............................................................. 25

Federal Judicial Ctr., Reference Manual on Scientific
    Evidence (3d ed. 2011) ........................................................... 41, 43, 53

H.R. Rep. 94-340 (1975) ........................................................... 10, 11, 13

## JURISDICTIONAL STATEMENT

The United States Environmental Protection Agency (EPA) promulgated the final fuel economy testing regulations challenged here pursuant to 49 U.S.C. § 32904(c). 89 Fed. Reg. 27,842, 28,203 (Apr. 18, 2024) (40 C.F.R. § 600.113-12), JA___–___. The Court therefore has jurisdiction. 49 U.S.C. § 32909(a).

## STATEMENT OF THE ISSUE

EPA promulgates the test procedures used to measure automobile fuel economy under the Nation's fuel economy laws. 49 U.S.C. § 32904(c); 26 U.S.C. § 4064(c)(1). But automobile fuel economy can change depending on the drive cycle or test fuel. To ensure an apples-to-apples comparison of efficiency over time, Congress required EPA to maintain test procedures that "give comparable [fuel economy] results" to the test procedures in place in 1975. 49 U.S.C. § 32904(c); *see also* 26 U.S.C § 4064(c)(1).

The gasoline used by automobiles has changed since 1975. Lead, for example, is out, while ethanol is in. To reflect these changes, EPA has periodically updated the test fuel it uses, most recently requiring use of "E10," a gasoline blend that includes about ten percent ethanol and is

now the most commonly sold automobile fuel. Because it has a lower energy content, the new E10 test fuel will lower actual automobile fuel economy. To maintain "comparable results," EPA has therefore promulgated a new rule that purports to adjust fuel economy to make up for the loss. The adjustment is premised upon a "sensitivity factor" that is intended to predict how new automobiles will respond to the change in the test fuel.

The issue presented is:

1. Whether EPA's "sensitivity factor" is unreasonable or unreasonably explained because EPA ignored serious flaws in its test design, improperly analyzed test data, failed to consider more accurate alternatives, and failed to respond to comments raising these concerns or to otherwise explain why its methodology was reasonable.

# INTRODUCTION

There is an inherent tension between claims of agency expertise and the scientific method. On the one hand, agency staff often do have knowledge of "a scientific or technical nature" that generalist courts lack. *Kisor v. Wilkie*, 588 U.S. 558, 571 (2019). On the other hand, however, the scientific process privileges knowledge not because of *who* says it, but because it arises from the rigors of the scientific method, which "is based on generating hypotheses and testing them to see if they can be falsified"—using reliable methods. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993).

The Administrative Procedure Act (APA) balances this tension by requiring federal agencies to jump through some basic hoops, including (1) that agencies give the public notice and opportunity to comment; and (2) that agencies provide a "reasoned response" to comments critiquing their methodology and technical findings. *Ohio v. EPA*, 144 S. Ct. 2040, 2053–54 (2024). The APA thus leaves close technical calls where Congress put them—with the agency—while simultaneously ensuring that agencies don't stray too far from the bounds of reasonableness, or adopt the attitude of Dr. Peter Venkman in *Ghostbusters* by saying,

3

essentially, "back off man, I'm a scientist," in lieu of providing a reasoned response.

Here, EPA failed to abide by this basic duty to act reasonably and explain its decision, and ultimately prescribed a fuel economy test procedure that does not "give comparable results" to prior test procedures, as required. 49 U.S.C. § 32904(c); 26 U.S.C. § 4064(c)(1). This is no mere technical foot fault. This statutory limit keeps EPA from effectively amending the stringency of the Nation's fuel economy laws through the backdoor—by changing the test procedures. Using flawed science, however, EPA seeks to evade that limit, all as part of a broader rulemaking effort that aims to destroy liquid fuels and mandate electric vehicles. *See* Exec. Order No. 14,037, 86 Fed. Reg. 43,583 (Aug. 10, 2021) ("setting a goal that 50 percent of all new" automobiles "sold in 2030" be electric).

The basic problem arises from EPA's inadequate effort to adjust vehicle fuel economy to account for the lower energy content of a new gasoline test fuel. The critical variable in EPA's adjustment is a "sensitivity factor" that purports to measure how automobile fuel economy will react to the change in the test fuel. EPA determined this

4

sensitivity factor based on a statistical analysis of its own vehicle testing program.

EPA's testing program and analysis, however, prompted extensive criticism during the rulemaking. Commentors, including automobile manufacturers and trade associations, submitted detailed comments. The comments explained that EPA's testing program could not accurately determine the sensitivity factor because it relied on a tiny sample of vehicles that are also not representative of the relevant fleet. The comments also explained that EPA's analysis of the data was unsound because the agency arbitrarily excluded a vehicle whose test results contradicted the outcome that EPA "expected" to find, and unreasonably retained a malfunctioning vehicle that biased the data but matched the results EPA "expected." Last, commenters explained that better data was available and submitted data from fuel economy certification tests and prior studies contradicting EPA's finding, including studies co-authored by EPA's staff.

Ordinarily, an agency faced with detailed technical criticisms would at least take them seriously. The agency would grapple with the critiques

and adjust its proposal, or at least provide an analytic defense of the technical basis for the rule.

That is not the path EPA chose here. Instead, EPA bided its time, waiting for more than three years until an opportunity arose to stitch its preferred sensitivity factor into a much larger and costlier Clean Air Act rulemaking, perhaps hoping that its test procedure would get lost in the shuffle.

For good reason. Despite sitting on the issue for years, the only response EPA mustered to mountains of specific technical criticisms was that its test program was "carefully designed and rigorously conducted." That conclusory assertion is no explanation at all, let alone a reasoned one.

Whatever the merits of the technical challenges at issue here—and they are substantial—the proper judicial response to EPA's stubborn refusal to grapple with important scientific criticisms is to vacate and remand the regulation.

## STATEMENT OF THE CASE

### I.    Statutory and Regulatory Background

#### A.    The Corporate Average Fuel Economy Program

In the wake of the 1973–74 Arab oil embargo, Congress sought to "provide for improved energy efficiency of motor vehicles." Pub. L. No. 94-163 § 2, 89 Stat 871, 874 (1975), *codified at* 42 U.S.C. § 6201(5). To that end, the law amended the Motor Vehicle Information and Cost Savings Act (the "Motor Vehicle Act") to add Title V, which requires gradual increases in the "fuel economy" of new "automobiles." *Id*. § 301, 89 Stat. at 903, *codified at* 49 U.S.C. § 32902(a)–(b). "[F]uel economy" is defined as "the average number of miles traveled by an automobile for each gallon of gasoline" or diesel used to propel the automobile. 49 U.S.C. § 32901(a)(10)–(11). The Secretary of Transportation has delegated his duty to administer this program to the Administrator of the National Highway Traffic and Safety Administration (NHTSA). 49 C.F.R. § 1.95(a).

The law works like this. "At least 18 months before the beginning of each model year," NHTSA must "prescribe by regulation average fuel economy standards for automobiles manufactured by a manufacturer in that model year." 49 U.S.C. § 32902(a). A NHTSA "standard" must "be

the maximum feasible average fuel economy level that … manufacturers can achieve in that model year," considering "technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy." *Id.* § 32902(a), (f). Because the NHTSA standards govern the "average fuel economy" of a manufacturer's fleet, the program is commonly known as the Corporate Average Fuel Economy (CAFE) program.

After setting a CAFE standard, NHTSA compares a manufacturer's average fuel economy to the standard applicable to the manufacturer's fleet. 49 C.F.R. § 531.6 & Part 531, App'x A, Fig. 1 (example). A manufacturer that exceeds the standard "earns credits." 49 U.S.C. § 32903(a), (c). A manufacturer that falls short, after considering credits, pays "civil penalties." *Id.* §§ 32911(b), 32912(b); 49 C.F.R. § 578.6(h)(2), *see also Nat. Res. Def. Council v. NHTSA*, 894 F.3d 95, 101 (2d Cir. 2018). Tighter fuel economy standards thus compel manufacturers to make automobiles that consume less fuel per mile driven. *Ctr. for Auto Safety v. NHTSA*, 793 F.2d 1322, 1324, 1332–33 (D.C. Cir. 1986).

## B.    The Gas Guzzler Tax

Since 1978, Congress has also imposed a "gas guzzler" tax to discourage manufacturers from making certain low-efficiency passenger automobiles. *See* 26 U.S.C. § 4064(a). The Internal Revenue Service collects the tax pursuant to a detailed statutory table that depends on an automobile's fuel economy. *Id.* For example, a manufacturer that produces a covered automobile with a measured fuel economy of "[a]t least 18.5 but less than 19.5" miles per gallon (mpg) owes the federal taxman $2,100. *Id.*

## C.    EPA's Role in Automobile Fuel Economy Testing

Although NHTSA prescribes the standards under CAFE, EPA administers the compliance math. Specifically, EPA must "calculate the average fuel economy of [each] manufacturer." 49 U.S.C. § 32904(a). EPA also prescribes test procedures that manufacturers use to measure the fuel economy of each new automobile model. *Id.* § 32904(c). EPA's fuel economy test procedures similarly govern the gas guzzler tax. 26 U.S.C. § 4064(c)(1).

Congress gave EPA this duty to reduce regulatory compliance burdens. EPA already had a regime in place to test new automobile

9

emissions under the 1970 Clean Air Act, and fuel economy can also be indirectly measured from an automobile's emissions, as explained below. *See* 49 U.S.C. § 32904(c) ("To the extent practicable, fuel economy tests shall be carried out with emissions tests under section 206 of the Clean Air Act."); 26 U.S.C. § 4064(c)(1) (same); *see also* H.R. Rep. 94-340, at 92 (1975), *reprinted in* 1975 U.S.C.C.A.N. 1762, 1854 (1975 House Report) (same).

Congress, however, placed an important limit on EPA's authority to amend the test procedures then in place. EPA must "use the same procedures for passenger automobiles the Administrator used for model year 1975 …, or procedures that give comparable results." 49 U.S.C. § 32904(c). In other words, when measuring the fuel economy of passenger automobiles, EPA has to keep the test procedures used in 1975, unless the modified procedures give "comparable [fuel economy] results." Congress enacted the same requirement for the gas guzzler tax. 26 U.S.C. § 4064(c)(1).

There is good reason for this requirement. Measured automobile fuel economy is highly sensitive to changes in the test procedures used. By changing test procedures, EPA could generate significant but

"illusory" changes in automobile efficiency, and thus effectively alter the stringency of the "maximum feasible" fuel economy standards set by NHTSA, or the tax set by Congress. *Ctr. for Auto Safety v. Thomas*, 847 F.2d 843, 846 (D.C. Cir.) (en banc) (Wald, C.J., concurring), *reh'g granted and vacated*, 856 F.2d 1557 (D.C. Cir. 1988) (per curiam); *see also* 1975 House Report at 92. By requiring tests that yield "comparable results" to the reference 1975 procedures, Congress ensured that EPA cannot change the stringency of the standards set by NHTSA or the tax set by Congress through a backdoor. 1975 House Report at 92. In other words, requiring "comparable results" keeps EPA in its proper lane, doing the measuring and the math, and prevents it from affecting the stringency of the fuel economy standards and Congress's prerogative to decide how much to tax. *Cf. Consumers' Rsch. v. FCC*, 2024 WL 3517592, at *9 (5th Cir. July 24, 2024) ("The power to tax is a quintessentially legislative one.").

### D.    EPA's Fuel Economy Test Procedures

Like most machines, automobile engines don't operate at a constant efficiency. Putting the pedal to the floor gives you maximum power, but not maximum fuel efficiency. To estimate efficiency across a range of

driving scenarios, EPA and manufacturers use a dynamometer or "dyno," a machine that simulates driving much like an exercise bike simulates cycling. *See* 40 C.F.R. § 1066.210; DOE, *How Vehicles Are Tested*, https://tinyurl.com/4yyk38x4. Since 1975, the fuel economy test procedures have required using the same two drive cycles: an urban, or city, cycle (also called the Federal Test Procedure, or FTP), and a highway cycle (also called the Highway Fuel Economy Test, or HFET). 49 U.S.C. § 32904(c); 40 C.F.R. § 600.101(a)(1); *see also* JA___ (speed profiles for each cycle).

Fuel economy is measured using a "carbon-balance" method, which is based on the principle of the conservation of mass: carbon in (as liquid fuel), equals carbon out (as carbon-related exhaust emissions). JA___, ___. The carbon-balance method works by dividing the fuel's carbon content per gallon by the measured carbon emissions per mile. The carbon "cancels out," and what's left is the automobile's fuel economy, in miles per gallon. JA___, ___, ___. This clever method allows manufacturers to indirectly estimate how fast an automobile is consuming fuel based upon how fast the automobile is consuming the fuel's carbon, using the existing exhaust emissions measuring procedures

required under the Clean Air Act, as Congress intended. JA___; 1975 House Report at 92.

### E.    The Prior Test Fuel Adjustment

Although the drive cycles used to measure fuel economy have remained the same, the fuels used to test fuel economy have changed, requiring adjustments to ensure "comparable results." 49 U.S.C. § 32904(c); 26 U.S.C. § 4064(c)(1).

Since 1975, automobile fuel economy has been measured using a gasoline test fuel commonly known as "indolene." 40 C.F.R. § 1065.710(c). Early on, EPA determined that a gallon of indolene had 2,421 grams of carbon. 41 Fed. Reg. 38,674, 38,689, 38,695 (Sept. 10, 1976). Calculating fuel economy was simple: divide that number by the average carbon emissions per mile. *See* 40 C.F.R. Part 600, App'x II(a), https://perma.cc/DDB3-RM4Y (calculation example).

In 1984, however, EPA proposed to adjust the fuel economy calculation to "account for changes in the properties of the test fuel used for gasoline-powered vehicles." 49 Fed. Reg. 48,024, 48,024 (Dec. 7, 1984). EPA acknowledged that "test fuel properties gradually shifted in the period between 1979 and June 1984." *Id.* In particular, the test fuel's

energy content had increased slightly as a result of the transition from leaded to unleaded gasoline. JA___, ___. Because a fuel's energy content has a significant effect on measured fuel economy, failing to account for even this small increase in energy content would have artificially rewarded manufacturers with an undeserved increase in automobile fuel economy. JA___–__.

Accounting for changes due to a change in a test fuel's energy content can be complicated, however: the fuel's effect on fuel economy will vary by vehicle depending on the vehicle's engine characteristics. JA___. EPA has therefore historically incorporated a "sensitivity factor" that estimates how automobile fuel economy will, on average, respond to a change in the test fuel's energy content. JA___. This sensitivity factor is known as the "R-factor," which is the percentage change in automobile fuel economy, divided by the percentage change in a test fuel's volumetric energy density. JA___–__, ___.

Based on test data from automobiles equipped with then-common open-loop carbureted engines, JA___, manufacturers suggested an R-factor of 0.6. 50 Fed. Reg. 27,172, 27,179 (July 1, 1985); 51 Fed. Reg. 37,844, 37,847 (Oct. 24, 1986). An R of 0.6 implies that for each

percentage change in the test fuel's energy density, automobiles respond with only a 0.6% change in fuel economy. JA___, ___. Manufacturers, however, warned that the R-factor should "be reevaluated in the future [as] … technological improvements can be expected to increase the value of the 'R' factor." 51 Fed. Reg. at 37,847.

In 1986, EPA accepted this R-factor and promulgated a revised carbon-balance equation that adjusts for changes in the test fuel energy content relative to the 1975 test fuel. 51 Fed. Reg. at 37,844. The resulting carbon-balance equation looks complicated, *see* 40 C.F.R. § 600.113-12(h)(1), but it is not. *See* JA___–___ (breaking it down); *see also* 40 C.F.R. Part 600, App'x II(b), https://perma.cc/DDB3-RM4Y (sample calculation). As revised, the equation multiplies the automobile's measured fuel economy by an adjustment factor. The factor adjusts for the change in the automobile's fuel economy due to the change in the test fuel's energy content (compared to the reference 1975 test fuel), while considering vehicle "sensitivity." *Id.*

A simplified example illustrates how the adjustment works. Imagine a gallon of the reference 1975 test fuel has ten units of energy, but a gallon of the new test fuel has five (i.e., its energy density has

decreased by 50 percent). If the adjustment only accounted for the difference in the fuel's energy content, then the adjustment would be two, because the energy of the test fuel has been halved (10/5=2). An automobile with a measured fuel economy of 10 mpg using the new lower-energy test fuel would have an adjusted fuel economy of 20 mpg (10 mpg × 2). This implies an R-factor of 1.0, which means that the vehicle's engine fully accounts for the change in the fuel's energy content (e.g., by adjusting air flow or fuel injection to ensure equally efficient operation). *See* JA___.

But some engines—like the open-loop carbureted engines manufactured when the R-factor was first introduced—cannot adjust perfectly to changes in the fuel's energy content, and so the R-factor may be less than 1.0. If the engine does not react particularly well, then the R-factor might be 0.6, which would result in a fuel economy adjustment of about 1.43 for this example. An automobile with a measured fuel economy of 10 mpg would therefore be credited with an adjusted fuel economy of 14.3 mpg, not 20 mpg. If the engine reacts better, but still doesn't fully account for the fuel's energy content, the R-factor might be 0.8, which results in an adjustment of about 1.67. An automobile with a

measured fuel economy of 10 mpg would have an adjusted fuel economy of 16.7 mpg. A summary of these examples is shown below.



**Effect of R on Adjusted Fuel Economy for Illustrative Test Fuel With 50% Lower Energy Density**

The R-factor thus plays a pivotal role in the fuel economy adjustment. To be sure, this example is just illustrative. The difference in the energy content of the gasoline test fuels used by EPA is smaller, so the corresponding effect of the R-factor on fuel economy is smaller too. JA___. But even so, differences in energy content across the test fuels matter, and small changes in the R-factor can lead to significant differences in adjusted automobile fuel economy. Using the wrong R-factor therefore won't yield "comparable results." 49 U.S.C. § 32904(c); 26 U.S.C. § 4064(c)(1).

When EPA promulgated the 1986 adjustment, it acknowledged that "as technological improvements allow an engine to more efficiently convert the heat energy content of the fuel to mechanical energy, the 'R' value may increase. If these sorts of technological improvements become predominant throughout the automobile industry, an 'R' value of 0.6 may not be representative and, thus, may require revision." 51 Fed. Reg. at 37,847. EPA therefore committed to "initiate a future regulatory review of the 'R' value if appropriate." *Id.*

Since then, gasoline engine technology has fundamentally changed. Manufacturers transitioned from open-loop, carbureted engines to closed-loop injection technologies that tightly control the mixture of fuel and air in the combustion chamber, and so can "fully react" to changes in fuel properties. JA___. Many studies since then have found that the R-factor for modern gasoline engines is essentially unity, or close to 1.0. JA___–__, ___, ___–__. But while engine technologies changed, EPA's R-factor remained the same.

EPA's inaction had limited relevance, however. Because the test fuel hadn't changed all that much since 1975 (i.e., it had a very similar

energy content), the fuel economy adjustment was small and so the outdated R-factor had little effect. JA___.

### F.    The New "E10" Test Fuel

The test fuel adjustment became highly relevant again in 2014, when EPA decided to change the gasoline test fuel to a fuel with significantly lower energy density: a gasoline blend containing ten percent ethanol (E10). JA___, ___; 79 Fed. Reg. 23,414, 23,526 (Apr. 28, 2014) ("[W]e are requiring all light-duty … gasoline vehicles to be certified to Tier 3 standards on federal E10 test fuel."); 40 C.F.R. § 86.113-15. Because the E10 test fuel's energy content is considerably lower than the 1975 test fuel's, using E10 will reduce automobile fuel economy if left unadjusted. JA___; *compare* 40 C.F.R. § 86.113-04 (indolene), *with* 40 C.F.R. § 1065.710(b)(2) (E10).

Although EPA required all manufacturers to switch to the new E10 test fuel by 2020 when certifying compliance with the new "Tier 3" emission standards, EPA deferred use of the E10 test fuel for fuel economy so the agency could investigate the sensitivity of modern vehicles to the change in test fuels. 79 Fed. Reg. at 23,531. This imposed a double testing burden on manufacturers: emissions had to be tested

using E10, but fuel economy had to be tested using indolene. EPA noted that it would use the resulting emissions certification data from new automobiles tested with both fuels to develop an appropriate sensitivity factor for the entire automobile fleet. 79 Fed. Reg. at 23,531–32; *see also* Response to Comments, EPA-420-R-14-004, at 4-347 (Feb. 2014) (Tier 3 Response to Comments), https://perma.cc/3AA5-MYWK.

Notably, EPA rejected comments arguing that an R-factor of 0.96 was warranted based on data from prior EPA and Department of Energy test programs. According to EPA, those datasets were inadequate because they were based on vehicles certified to comply with old "Tier 2" emission standards, not the new Tier 3 standards. Tier 3 Response to Comments at 4-353.

## II.    The Proposed Adjustment for E10

But then things changed. Instead of using automobile certification data, EPA decided to run its own test program (the Test Program) to evaluate the effect of the change in test fuels on fuel economy. JA___.

### A.    The EPA Test Program

For the Test Program, EPA gathered eleven vehicles it had available in its Michigan testing facility, left over from other test

20

programs. JA___–__. EPA asserted that these vehicles "represent a variety of technologies likely to be used … in the future." JA___. The tested vehicles ranged in model year from 2013 to 2016 and included seven passenger cars (e.g., a Honda Civic), three light-duty trucks (e.g., a Ram 1500), and one heavy-duty truck (the Chevrolet Silverado 2500). JA___, ___–__. EPA drove each vehicle over both drive cycles, using both the indolene and E10 test fuels. JA___, ___–__. EPA then calculated the corresponding change in fuel economy for each vehicle. Fuel economy fell significantly in both test cycles when using the E10 test fuel, indicating a high sensitivity or R-factor, as shown by EPA's chart, reproduced here. JA___, Figure III-2.



One of the vehicles, a 2013 Malibu (Malibu 1), had a far smaller response to the change in test fuels, particularly on the highway cycle. As EPA's report further noted, this automobile "had an accelerator fault code occasionally occur on the [highway] tests with a message indicating reduced engine power." JA___.

By contrast, the Acura responded to the changed fuel the most. Although, unlike the Malibu 1, this vehicle was functioning normally, EPA noted in its report that it was concerned with the Acura's "unexpected" results. JA___–__.

**B.    The 2020 Proposed Rule**

In 2020, EPA proposed to revise the fuel economy test procedures in several respects. As relevant here, EPA proposed to replace the R-factor with a new sensitivity factor it called "$R_a$." JA___. According to EPA, the new $R_a$ factor accounts for the change in fuel economy due to the new E10 test fuel (like the prior R-factor), and any minor effects resulting from EPA's revision of the methods used to determine the test fuel's properties. *Id.*

Based on its analysis of fuel economy data from ten of the Test Program's eleven vehicles, EPA proposed "an $R_a$ value of 0.81" for the

vehicle fleet. *Id*. EPA excluded the Acura from its analysis because its results were "unexpected." JA___. EPA didn't provide the individual $R_a$ factors for each Test Program vehicle, but commenters calculated them using EPA's data: $R_a$ varied considerably—from approximately 0.44 (for the faulty Malibu 1) to 1.27 (for the excluded Acura). JA___, ___.

**Individual Vehicle $R_a$ Factors**



| Vehicle | $R_a$ |
|---|---|
| 2013 Malibu 1 | 0.44 |
| 2013 Altima | 0.75 |
| 2016 Malibu 2 | 0.76 |
| 2016 Silverado 2500 | 0.76 |
| 2015 Volvo S60 T5 | 0.78 |
| 2014 Ram 1500 | 0.79 |
| 2016 Civic | 0.89 |
| 2014 Mazda3 | 0.96 |
| 2014 Silverado 1500 | 0.99 |
| 2015 F150 Eco-Boost | 1.05 |
| 2016 Acura ILX | 1.27 |

## III.    The Comments

Affected parties, including the Alliance for Automotive Innovation (the "Alliance")—the leading automotive trade association—as well as stakeholders in the liquid fuels supply chain, filed detailed comments objecting to EPA's proposed $R_a$ factor. JA___–___. Commenters criticized the Test Program for having too few vehicles, and the wrong vehicles.

They also criticized EPA's analysis of the data, and argued that EPA ignored the best available data.

### A.    Comments Explain the Flaws in the Test Program's Design

Commenters argued that the Test Program was flawed according to EPA's own standards.

***Not enough vehicles.*** First, commenters explained that the number of vehicles analyzed, just ten, was too small to represent the entire fleet, which numbers approximately 15 million new automobiles each year and spans hundreds of models and configurations. Individual $R_a$ results from EPA's small sample varied widely from one vehicle to the next, so commenters argued that EPA needed to test far more vehicles to determine a fleetwide $R_a$ factor with any reasonable degree of statistical accuracy. JA___–__, ___, ___–__.

EPA, itself, had reached the same conclusion earlier. When considering California's request to use a new test fuel, EPA said that "to reach a conclusion regarding the appropriate R factor for [the new test fuel], EPA would need city and highway tests ... for a minimum of 75 to 100 … vehicles." EPA Guidance Letter CD-95-09, at 3 (June 1, 1995),

https://tinyurl.com/4s26ytww. Commenters noted that EPA had ignored its own guidance. JA___, ___.

**_Wrong vehicles._** Second, commenters pointed out that EPA's ten vehicles were not representative of the future fleet. JA___–__, ___. As EPA previously had observed, the sensitivity factor is "best assessed" on automobiles "using Tier 3 technology" designed to meet the latest emission standards. Tier 3 Response to Comments at 4-353. But commenters noted that only one of the Test Program's automobiles (the Honda Civic) was a Tier-3 certified vehicle, again violating EPA's own criterion.[1] JA___.

Commenters also raised other serious problems with EPA's vehicle selection. JA___–__, ___–__. They noted that, even by model year 2020 standards, the vehicles EPA tested were old and out-of-date, not vehicles of the "future." Several had engines that were no longer offered by manufacturers. JA___ & n.142, ___. And the distribution of fuel-efficiency technologies in the Test Program's vehicles didn't come close to representing the share of efficiency technologies in the then-recent,

---

[1] It appears the 2016 Silverado 2500 was certified to the Tier 3 exhaust emission standards for heavy-duty vehicles, but it is not an "automobile." *See infra*; *see also Certificate of Conformity*, https://tinyurl.com/2kd74xfp.

model year 2019 fleet. JA\_\_\_–\_\_. Commenters also questioned EPA's inclusion of high-displacement engine vehicles, which are unlikely to be widely used in the future automobile fleet because they have high energy losses. JA\_\_\_. This includes the Silverado 2500, which is a "work truck," 49 U.S.C. § 32901(a)(19), not an automobile, and so isn't even subject to CAFE, *id.* § 32901(a)(17), (18). Commenters also questioned EPA's proposal to extend its $R_a$ factor to "premium-required" gasoline automobiles, even though the agency hadn't tested a single premium-required automobile. JA\_\_\_.

## B.    Comments Explain the Flaws in EPA's Data Analysis

Commenters also raised problems with EPA's analysis of the Test Program's data. JA\_\_\_–\_\_, \_\_\_–\_\_\_.

***Arbitrarily including a malfunctioning vehicle.*** Commenters noted that the vehicle with by far the lowest $R_a$ factor, Malibu 1, was a significant outlier based on standard statistical tests and exhibited alarming behavior, repeatedly registering an "accelerator fault" code when testing with indolene during the highway cycle. JA\_\_\_–\_\_, \_\_\_–\_\_. As the Alliance explained, this is "a very serious fault" that causes the vehicle to "go into reduced power mode," and results in "parasitic losses"

that lower fuel economy. JA___. Because this fault code was active during the indolene test runs, but not the E10 runs, "a bias was introduced to the data." *Id*. "Under normal certification test protocols,"—the protocols manufacturers use for compliance—the results would have been declared invalid and excluded. *Id*.

***Arbitrarily excluding "unexpected" results.*** Although EPA included vehicles that should have been excluded from the analysis, it arbitrarily tossed the results it didn't like—from the Acura. JA___–__, ___–__. EPA excluded the Acura's data purportedly because it exhibited "unexpected" sensitivity to the test fuel's octane. JA___. But commenters pointed out that it was scientifically improper to exclude data merely because it was "unexpected"; that EPA hadn't explained why octane sensitivity was disqualifying; and that, in any event, any octane sensitivity in the Acura was insignificant and well within an acceptable margin. JA___, ___–__.

Commenters also explained that EPA's analytical errors weren't harmless. Each had a significant effect on the calculated $R_a$. Excluding the faulty Malibu 1 and including the Acura would increase the calculated $R_a$ factor to 0.90. JA___, ___, ___, ___, ___.

27

### C.    Comments Offer Better Alternative Data

Commenters didn't just criticize: they also provided EPA with alternative data sets.

Consistent with EPA's own stated approach in 2014, the Alliance provided "paired" certification data from nearly 100 newer, model year 2016 through 2021 vehicles using both test fuels. JA___–__, ___–__, ___–__. This certification data showed the average $R_a$ factor was "much closer to … 1.0." JA___.

In the proposal, EPA asserted that using manufacturer certification data was "not possible" due to newfound concerns with "test-to-test variability." JA___. The Alliance, however, explained that test-to-test variability was minor, and was far outweighed by the vehicle-to-vehicle variability inherent in a small sample size, which EPA virtually ignored. JA___. EPA, in other words, focused like a laser on preventing variability within individual vehicle tests, while disregarding the far greater problem of variability across vehicles resulting from its tiny sample size.

Other commenters suggested that EPA could look to all other studies co-authored by EPA's own staff. JA___–__. Although, like EPA's Test Program, these studies tested Tier 2 vehicles, they performed more

tests (on more vehicles and more fuels) and so could determine $R_a$ with greater accuracy than EPA's Test Program. JA___−__, ___−__. All prior studies offered by commenters found sensitivity factors that were higher than EPA's. JA___−__.

Based on manufacturer certification data and all prior published studies, commenters recommended that EPA set $R_a$ to 1.0 or a value approaching 1.0. *See, e.g.*, JA___−__, ___−__, ___−__, ___−__.

## IV. EPA Ignores Comments and Promulgates the Final Rule

Faced with these criticisms, EPA tabled the proposed rule, for a while. But three years later, the proposal reemerged, now buried in an enormous, complex, and highly controversial Clean Air Act rulemaking that aims to eliminate two-thirds of the market for new internal-combustion automobiles. In a single paragraph of a proposal spanning 263 pages of the Federal Register, EPA proposed adopting the "revised equation for calculating fuel economy that uses an 'R-factor' of 0.81," as "described in the 2020 proposal." JA___. EPA stated it would "be reevaluating comments received on the 2020 proposal as well as the comments for this proposal." *Id*. Parties renewed their objections in comments. JA___−__.

EPA promulgated the proposed sensitivity factor anyway. The Final Rule barely mentions $R_a$. EPA states that, despite comments arguing the sensitivity factor should be "[e]qual to 1.0," EPA was "finalizing an R-Factor of 0.81 based on the technical analysis provided in the 2020" proposal. JA___. EPA referred to its "Response to Comments" document "for a more detailed discussion." JA___.

But EPA's "discussion" devoted just two paragraphs to defending its sensitivity factor, reproduced here in their entirety:

> [W]e are retaining the updated $R_a$-factor of 0.81 to represent equivalent fuel economy performance within the CAFE program. This factor was generated from a study carefully designed and rigorously conducted at EPA's lab. The decision to include data from the 2013 Malibu was based on its performance being within the expected range.
>
> In addition, we want to clarify that R-factor values in the literature (e.g., in Sluder, *et al.*) are generally intended to isolate the actual sensitivity of fuel economy to fuel energy content, while the $R_a$ factor here rolls up multiple impacts related to this specific pair of test fuels that include the energy content difference, additional charge cooling due to ethanol's heat of vaporization, and potentially some marginal impacts of the octane change. Thus, we wouldn't expect this $R_a$ value to precisely match other R-factors found in the literature. JA___.

That response is anything but "detailed."

## SUMMARY OF THE ARGUMENT

The Final Rule is arbitrary and capricious because EPA failed to grapple with important criticisms explaining that (1) its Test Program was poorly designed to determine a sensitivity factor for the fleet of automobiles because it didn't test enough vehicles and tested unrepresentative vehicles, (2) EPA's analysis was flawed because it arbitrarily excluded a vehicle with a high sensitivity factor, and wrongfully included biased data from a malfunctioning vehicle with a low sensitivity factor, and (3) EPA ignored better alternative data submitted in comments.

## ARGUMENT

### I.    Petitioners Have Standing

An association has constitutional "standing to bring claims on behalf of its members when (1) individual members would have standing, (2) the association seeks to vindicate interests germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the individual members' participation." *Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*, 37 F.4th 1078, 1084 (5th Cir. 2022) (footnote omitted). Petitioners satisfy these associational standing requirements.

31

An individual member has standing if it can "show: (1) an injury in fact; (2) that is traceable to the defendant's challenged conduct; and (3) that is likely to be redressed by a favorable decision" of the court. *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006). An association "need only show that just one of its members" satisfies this inquiry. *Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 309 (5th Cir. 2023). An individual member may establish standing by showing a "substantial risk" that it will suffer harm through the "predictable effect of Government action on the decisions of third parties,"—here, automobile manufacturers. *Dep't of Commerce v. New York*, 588 U.S. 752, 767–68 (2019). Furthermore, for "purposes of the standing analysis," the Court must "assume … that [Petitioners are] correct on the merits of [their] claim"—here, that the $R_a$ factor is too low to produce comparable results. *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019); *see infra* Part II.

Petitioners' members have standing. EPA's $R_a$ factor of 0.81 is too low, and so underestimates the compliance fuel economy of automobiles using the E10 test fuel by approximately 0.5 to 0.6 percent (compared to using an accurate $R_a$ of 1.0). JA___, ___–__, ___ & n.79. As EPA has

explained: "Any change to the test procedures used by EPA for the 1975 model year which would necessarily result in a systematically lower average fuel economy than that measured by the 1975 model year procedures would increase the stringency of the CAFE standards." 50 Fed. Reg. at 27,172. That is what happened here.

Manufacturers will predictably respond by increasing the average fuel economy of their automobile fleets to achieve this "increase[d] stringency." The Motor Vehicle Act's civil penalty scheme is designed to make sure of that.[2] 49 U.S.C. § 32912(b); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 174 (2000) ("civil penalties … deter future violations"); *Nat. Res. Def. Council*, 894 F.3d at 205 ("by automakers' own admission, the … [CAFE] penalty has the potential to affect automakers' business decisions and compliance approaches" including "changes to some design and fleet mix" (internal

---

[2] A manufacturer must pay $17 for each 0.1 mpg its fleet falls below the standard, multiplied by the automobiles it manufactured that model year. 49 U.S.C. § 32912(b); 49 C.F.R. § 578.6(h)(2). Based on NHTSA's recent standards, EPA's $R_a$ of 0.81 will underestimate automobile fuel economy by approximately 0.3 mpg. *See* 89 Fed. Reg. 52,540, 52,548 Tbl. I-3 (June 24, 2024). A shortfall of that magnitude would cost manufacturers approximately $5.1 million in penalties for every 100,000 automobiles manufactured. For context, manufactures produce some 15 million new automobiles each year.

quotation marks omitted)). And more stringent *de facto* fuel economy requirements will predictably decrease domestic demand for automobile gasoline. *See* Add.Ex.A (Myers Declaration ¶¶ 9–13).

For the same reasons, by decreasing the compliance fuel economy of the fleet, EPA's $R_a$ factor of 0.81 will predictably increase the amount manufacturers pay under the gas guzzler tax, discouraging them from making high-performance automobiles that use more fuel. *See* 26 U.S.C. § 4064(a). The fewer gas-guzzlers there are on the road, the less gas gets guzzled.

Petitioners' members span the gasoline fuel supply chain and are economically harmed by a rule that reduces gasoline demand.

The members of the Texas Food & Fuel Association (TFFA) include companies that sell and distribute gasoline to retailers, and whose revenues scale with the amount of gasoline consumed by automobiles. Even a small decrease in gasoline demand has a large effect on these members' profitability, because profit margins (per gallon) are low, and fuel distributors face high fixed costs. TFFA's members also include owners and operators of convenience stores, filling stations, and truck stops that sell automotive gasoline. These members depend on gasoline

sales to generate revenue, including from sales of other products and services to customers who visit their stores while filling up their automobiles' gas tanks. Moreover, many distributor and retail members of TFFA are contractually obligated to meet minimum annual gasoline sales. Failure to meet these minimums not only decreases their profit, but also often results in financial penalties. *See* Add.Ex.B (Hardin Declaration).

The "economic injury" to TFFA's members from decreased automobile gasoline demand "is a quintessential injury upon which to base standing." *Tex. Democratic Party*, 459 F.3d at 586; *see also Clinton v. City of New York*, 524 U.S. 417, 433 (1998) ("petitioner who is likely to suffer economic injury as a result of [governmental action] that changes market conditions satisfies" the injury-in-fact test (citation omitted)). "Common sense and basic economics" dictate that reduced demand for gasoline means fewer stops at members' convenience stores, filling stations, and truck stops, and so fewer sales of gasoline and other products. *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 (D.C. Cir. 2017). The resultant "[e]conomic harm to [members'] business[es] clearly constitutes an injury-in-fact." *Zinke*, 854 F.3d at 5; *see* Add.Ex.B (Hardin

Declaration ¶¶ 3–5, 12–13). The amount of harm attributable to EPA's erroneously low $R_a$ may be difficult to determine with certainty, but that "is irrelevant. A dollar of economic harm is still an injury-in-fact for standing purposes," and TFFA's members certainly face more than a loss of a dollar. *Zinke*, 854 F.3d at 5; *see also Louisiana v. Dep't of Energy*, 90 F.4th 461, 468 (5th Cir. 2024) (Petitioners are "injured to the extent of [the] lost opportunity. And the *magnitude of this lost option is not material to the standing inquiry* because the inquiry turns only on whether an injury 'actually exist[s].'" (emphasis added))

Texas Corn Producers, Texas Sorghum Producers, and National Sorghum Producers' members are farmers who grow corn and sorghum for domestic sale. Corn and sorghum are critical feedstocks for the ethanol used in E10, which comprises almost all automobile gasoline sold in the United States. And ethanol production is one of the primary markets for these domestically produced crops. The reduced consumption of E10 that results from EPA's $R_a$ decreases the market for corn and sorghum feedstocks, driving down crop prices and members' profits. *See* Add.Ex.C (Gibson Declaration), Add.Ex.D (Lust Declaration), Add.Ex.E (Cleveland Declaration). The "threat of reduced sales" and related

economic loss "is sufficiently concrete" to constitute injury-in-fact. *Tex. Ass'n of Mfrs. v. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 377 (5th Cir. 2021) (threat of reduced sales of raw materials is an injury-in-fact).

"Causation and redressability … flow naturally" from these injuries. *Young Conservatives*, 73 F.4th at 310 (quoting *Contender Farms, L.L.P. v. USDA*, 779 F.3d 258, 266 (5th Cir. 2015)). EPA's sensitivity factor of 0.81 will decrease gasoline demand, and members' injuries will "likely" be redressed by a judgment vacating the factor and remanding for determination of a lawful value. *Tex. Democratic Party*, 459 F.3d at 586–87. "[T]he fact that [EPA] might … come to the same decision after abiding by the contested procedural requirement does not deprive [Petitioners] of standing." *Dep't of Educ. v. Brown*, 600 U.S. 551, 561–62 (2023).

Although EPA's sensitivity factor is "technically directed at vehicle manufacturers," the effect is to tighten a "regulatory hurdle" that will predictably "imped[e]" use of Petitioners' members' products. *Energy Future Coal. v. EPA*, 793 F.3d 141, 144 (D.C. Cir. 2015) (Kavanaugh, J.). In this scenario, Petitioners are "an object of the action (or forgone action) at issue," and so there is "little question" they have injuries that would

be redressed by vacating the challenged regulation. *Id.* (quoting *Lujan v. Def. of Wildlife*, 504 U.S. 555, 561-62 (1992)). Petitioners' members individually have standing.

Petitioners also meet the second and third requirements for associational standing. *See Students for Fair Admissions*, 37 F.4th at 1084. TFFA, Texas Corn Producers, Texas Sorghum Producers, and National Sorghum Producers exist to represent the economic and legal interests of their members. Add.Ex.B (Hardin Declaration ¶ 2); Add.Ex.C (Gibson Declaration. ¶ 2); Add.Ex.D (Lust Declaration ¶ 2); Add.Ex.E (Cleveland Declaration ¶ 2); *see Tex. Entm't Ass'n, Inc. v. Hegar*, 10 F.4th 495, 504–05 (5th Cir. 2021). And because Petitioners seek only declaratory and injunctive relief, individual member participation is unnecessary. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977).

Petitioners are also within the class of plaintiffs Congress authorized to sue. The Motor Vehicle Act provides that any "person that may be adversely affected by a regulation prescribed in carrying out … [section 32904] … may apply for review of the regulation." 49 U.S.C. § 32909(a)(1); *see also Ctr. for Auto Safety*, 793 F.2d at 1337 (Act "clearly

removes the judicial authority to create prudential barriers by granting review of agency action to those 'who may be adversely affected.'"); *Competitive Enter. Inst. v. NHTSA*, 901 F.2d 107, 118–19 (D.C. Cir. 1990) (same). As explained above, Petitioners "may be adversely affected" by EPA's regulation, and so are "entitled to judicial review." 5 U.S.C. § 702.

## II.   EPA's $R_a$ Sensitivity Factor of 0.81 Is Arbitrary

Federal agencies must "engage in reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (cleaned up). This requires, at a minimum, that agency decisions "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Accordingly, courts "must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces 'a clear error of judgment.'" *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021); 5 U.S.C. § 706(2)(A). To "determine whether the agency considered the relevant factors," the Court examines "whether the agency addressed" the "significant points raised by the public comments." *Mexican Gulf Fishing Co. v. Dep't of Commerce*, 60 F.4th 956, 971 (5th Cir. 2023) (cleaned up).

EPA's sensitivity factor of 0.81 was neither reasonable nor reasonably explained. Commenters explained—in painstaking detail—that EPA's sensitivity factor was based on a flawed Test Program and flawed analysis, and wouldn't yield "comparable results," as the law mandates. 49 U.S.C. § 32904(c). And commenters provided alternate data that would yield a more accurate value. But instead of answering with "a complete analytic defense" of its method, EPA brushed away arguments and evidence. *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1052 (D.C. Cir. 2001) (per curiam). "EPA merely assert[ed], without adequate explanation, that each choice [it made] was reasonable." *Id*. at 1054.

EPA's sensitivity factor is unreasonable. And the agency's refusal to address significant comments criticizing the agency's approach, to explain its changes in position, or to consider better alternatives, are hallmarks of arbitrary decisionmaking. *Ohio*, 144 S. Ct. at 2054; *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*"). The Court has "no choice but to remand." *Appalachian Power Co.*, 249 F.3d at 1055.

40

### A.    EPA Arbitrarily Ignored Serious Flaws in the Test Program's Design

Commenters identified serious flaws with EPA's Test Program that, "if true … would require a change in [EPA's] proposed rule," and so are "significant." *Mexican Gulf Fishing Co.*, 60 F.4th at 971. But rather than addressing—or even acknowledging—these concerns, EPA simply responded that its Test Program was "carefully designed and rigorously conducted." JA___. This non-response "is the epitome of arbitrary and capricious action." *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 641 (5th Cir. 2023).

#### 1. *EPA ignored comments raising significant design flaws with the size of the tested fleet*

"Generally, increasing the size of the sample will reduce the level of random error ('sampling error')," and so increase confidence that the sample accurately estimates the population. Federal Judicial Ctr., Reference Manual on Scientific Evidence 246 (3d ed. 2011). If the population "being sampled is heterogenous, random error will be large; a larger sample will be needed to offset heterogeneity." *Id.* Given the heterogeneity of vehicle responses to a change in test fuel, EPA did not test nearly enough vehicles to determine a sensitivity factor for the entire

automobile fleet with reasonable accuracy.

As commenters explained, the largest source of uncertainty in determining an average fleetwide $R_a$ is the large "variability in the actual $R_a$ across different vehicles." JA___; *see also* JA___–__. An automobile's sensitivity to a change in test fuel depends on the vehicle's engine technology, and so the $R_a$ factor can vary greatly from one vehicle to the next. Even in EPA's tiny sample of eleven vehicles, $R_a$ varied by approximately 0.83, from Malibu 1 ($R_a$ = 0.44) to the Acura ($R_a$ = 1.27). JA___, ___. Manufacturer data from nearly 100 vehicles show a larger range of sensitivity factors. JA___, Figure 2.5. And EPA's own analysis of tested vehicles' fuel economies confirms that vehicle-to-vehicle variability is far greater than test-to-test variability. *See* JA___, Table 4.3.1 (for the change in highway fuel economy, calculating a vehicle-to-vehicle, or "between-vehicle," variance of 0.340, compared to a test-to-test, or "within-vehicle," variance of 0.0645).

This heterogeneity makes determining a reasonably accurate value for the fleetwide $R_a$ factor difficult. When only a small number of vehicles are tested, "cho[osing] … a slightly different vehicle mix" in the sample can "resul[t] in a significantly different" determined $R_a$, so there is a

significant risk that a small sample will be unusual. JA___. One way to account for this risk is to test more vehicles, which reduces the influence of any one vehicle and provides greater confidence that the $R_a$ of the sample accurately estimates the $R_a$ of the fleet. *See* Reference Manual on Scientific Evidence, *supra* at 246.

How many vehicles did EPA have to test? When considering a similar change in test procedures in 1995 for California vehicles, EPA determined in official guidance that "to reach a conclusion regarding the appropriate R factor for [the new test fuel], EPA would need city and highway tests on both … test fuel[s] … *for a minimum of 75 to 100 … vehicles*." EPA Guidance Letter CD-95-09, at 3 (emphasis added). But EPA based its determination here on only *ten* vehicles, far short of this "minimum."

To top it off, EPA would apply its $R_a$ factor not just to the fleet of automobiles, but to the fleet of heavy-duty trucks and vans as well, JA___, which are "work trucks," not automobiles. 49 U.S.C. § 32901(a)(19). These trucks are not subject to the CAFE standards, *id.* § 32902(k), or to the same Clean Air Act emission standards as automobiles, 42 C.F.R. § 86.1816-18; JA___ and so tend to have different

engines and likely different sensitivity factors. The size of the tested fleet? One vehicle, the Silverado 2500. JA___. EPA would also apply its $R_a$ to the fleet of premium-required gasoline vehicles, which also generally have different engine technologies (e.g., high-compression) and use a different "high-octane" E10 test fuel. 40 C.F.R. § 1065.710(d). The size of the tested fleet of "premium-required" vehicles? Zero. JA___. That's right, zero.[3]

The agency's *only* response to commenters' critique of the size of its Test Program was that its $R_a$ factor "was generated from a study carefully designed and rigorously conducted at EPA's lab." JA___. But this assertion whistles past, rather than addresses, commenters' detailed criticisms. A "single conclusory sentence … is no substitute for a 'reasonable and reasonably explained' decision." *Texas v. Biden*, 10 F.4th 538, 554 (5th Cir. 2021) (per curiam). And, even so, this Court owes no "defer[ence] to [EPA's] conclusory or unsupported suppositions." *Id.* at 556 (quoting *United Techs. Corp. v. Dep't of Defense*, 601 F.3d 557, 562 (D.C. Cir. 2010)).

---

[3] Over a quarter of new automobiles are "premium-required." DOE, Fact of the Week #1353, https://perma.cc/32GN-SE94.

Worse, EPA's response "did not expressly mention, let alone meaningfully discuss" the agency's prior conclusion that determining the fleetwide sensitivity factor requires gathering data from at least 75 to 100 vehicles, more than seven times as many as it used here. *Id*. at 554; *see* EPA Guidance Letter CD-95-09, at 3. "At a bare minimum, when an agency changes its existing position, it must at least display awareness that it is changing position and show that there are good reasons for the new policy." *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 189 (5th Cir. 2023) (cleaned up). EPA's "unexplained inconsistency" regarding the number of vehicles that must be tested is, alone, sufficient "reason for holding" EPA's sensitivity factor "arbitrary and capricious." *Id*. (quoting *Encino Motorcars*, 579 U.S. at 222).

EPA had lawful alternatives to ensure "comparable results." 49 U.S.C. § 32904(c). It could have selected a value for $R_a$ based on manufacturer certification data or published studies, which tested more vehicles (and sometimes more fuels) and so could determine the fleetwide $R_a$ with more certainty. It could have determined "comparable" fuel economy results without any sensitivity factor, as suggested by commenters. *See, e.g.,* JA___. Or, of course, EPA could have provided a

"complete analytic defense" of its Test Program, and explained why it doesn't need to test more vehicles to ensure an accurate adjustment. *Appalachian Power Co.*, 249 F.3d at 1052. What it can't do is cover its ears and repeat "carefully designed and rigorously conducted" like a mantra.

EPA's "reli[ance] upon insufficient empirical data" renders its $R_a$ factor arbitrary and capricious. *Business Roundtable v. SEC*, 647 F.3d 1144, 1151 (D.C. Cir. 2011). So does its utter failure to respond to comments about the need to test more vehicles. *Mexican Gulf Fishing Co.*, 60 F.4th at 971–73.

### 2. EPA ignored comments raising significant design flaws with the vehicle characteristics of the tested fleet

EPA also tested the wrong vehicles. In 2014, when EPA announced the switch to E10, the agency explained it would need data from vehicles *certified to the Tier 3 standards* to "assess the 'R' value and the impact of the fuel change on the stringency of the CAFE … standards." 79 Fed. Reg. at 23,532. As EPA then explained, that is because the "R-factor … is best assessed on vehicles using Tier 3 technology," i.e., vehicles designed to comply with the Tier 3 emissions standards using the E10 test fuel. Tier 3 Response to Comments at 4-353; *see also* 79 Fed. Reg. at 23,531 (the

"potential effects [of changing to an E10 test fuel] are best understood using emission data generated on Tier 3/LEV III vehicles tested on both Tier 3 and Tier 2 test fuel").[4]

In its 2020 proposal, EPA again emphasized the importance of selecting appropriate, representative vehicles to determine $R_a$. Because the sensitivity factor is meant to "estimate test fuel effects into future years," it was "critical that the agency select vehicles equipped with technologies that represent how the fleet will look in the future (rather than how the fleet looks today)." JA___. Given the importance of this, EPA invited comment on the "test vehicle selection ... and on the specific technologies ... selected." JA___.

But the vehicles EPA tested—all from model years 2013 to 2016—were *not* representative of the 2019 automobile fleet, much less the model year 2027 and beyond fleets to which $R_a$ will apply. Of the seven passenger automobiles tested, only one (the 2016 Civic) was certified to the new Tier 3 standards; the rest were certified to older Tier 2 emission standards, which EPA previously said were "[in]appropriate" vehicles for

---

[4] LEV III refers to California's low-emission vehicle (LEV) emissions standards, which require use of a similar E10 test fuel. JA___–__, ___.

determining the sensitivity factor for the E10 test fuel. Tier 3 Response to Comments at 4-353. Several vehicles with lower sensitivity factors included lower-efficiency high-displacement engines that had already been phased-out by 2020 in order to comply with tighter fuel efficiency mandates. This matters because "[f]uel effects on … fuel economy relate primarily to combustion characteristics of the engine." JA___; *see also* JA___ & n.142, ___, ___.

Compounding the error, the distribution of technologies EPA found in its Michigan facility's garage did not "represent how the fleet … look[ed]" in 2019, much less how it looks today or how it will look in the future. JA___; *see also* JA___. For example, only one of the ten vehicles included in the analysis, the Ram 1500, had an advanced transmission with seven or more discrete speeds (7+ gears). But in the model year 2022 fleet of gasoline automobiles, nearly 60% did. Given the sensitivity of $R_a$ to vehicle technologies, tests on automobiles with a substantially different distribution of technologies cannot be expected to yield an accurate value of $R_a$ for the fleet. The following table illustrates just some of the efficiency technologies that go underrepresented in EPA's Test Program.

**Underrepresented Technologies in Test Program**

[Source: JA__, Table III-2, __, Table 3.2,

does not include the excluded Acura][5]

|  | CVT | 7+Gears | Cylinder Deactivation | StopStart | Hybrid |
|---|---|---|---|---|---|
| Test Program | 20% | 10% | 10% | 20% | 0% |
| MY 2019 | 24% | 48% | 13% | 36% | 6% |
| MY 2022 | 26% | 59% | 16% | 50% | 10% |

EPA, however, ignored the vehicle selection problems raised by commenters, and repeated its mantra: the $R_a$ factor "was generated from a study carefully designed and rigorously conducted at EPA's lab." JA___. EPA again failed to acknowledge its previous statements regarding the need to test vehicles certified to Tier 3 emission standards, much less explain why it departed from this position. But "trust us, we're experts" doesn't cut it. Although EPA's "experience and expertise" with fuel economy testing "presumably enable the agency to provide the required explanation, … they do not substitute for the explanation." *Texas*, 10 F.4th at 556.

---

[5] Model year 2022 data taken from The 2023 EPA Automotive Trends Report, at 43, Figure 4.2, https://perma.cc/9XPH-6YLB.

Just as an $R_a$ based on too few vehicles cannot ensure "comparable" fuel economy results, 49 U.S.C. § 32904(c), neither can an $R_a$ based on vehicles with outdated technology, or vehicles not covered by CAFE. To accurately represent the fleet, EPA would have to "change … [its] proposed rule." *Mexican Gulf Fishing Co.*, 60 F.4th at 971. EPA's failure to address comments about its vehicle selection, or to acknowledge the inconsistency with its prior statements regarding the need to test Tier 3 vehicles, was thus arbitrary. *Id.*; *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (an "agency may not … depart from a prior policy *sub silentio*" and "must show that there are good reasons for the new policy").

## B.    EPA Arbitrarily Excluded and Included Data

Commenters also pointed out that EPA's analysis of the Test Program's data was flawed. The agency's arbitrary exclusion of the Acura (which would have increased $R_a$) and improper inclusion of the malfunctioning Malibu 1 (which lowered $R_a$) fatally biased EPA's analysis. EPA's sensitivity factor of 0.81 is thus unreasonable, and the agency's failure to address comments raising the issue was arbitrary and capricious.

50

***Arbitrarily excluding the Acura.*** Although EPA initially tested eleven vehicles, it used data from only ten of those vehicles in its analysis, excluding the 2016 Acura, which had the highest individual $R_a$. JA___, ___, ___, ___.

Why? EPA singled out the Acura because it "showed a noticeably larger fuel economy difference than other vehicles on the highway cycle." JA___. EPA then decided to investigate the Acura by testing it with the higher octane premium E10 fuel, and found the carbon emissions were lower than when using regular E10, suggesting the Acura had a higher fuel economy when operating on the higher octane premium E10 fuel. JA___–__. Under EPA guidance, manufacturers have been required to attest that a vehicle's fuel economy doesn't change more than three percent when switching from the Tier 2 test fuel (which has a higher octane, similar to today's premium gasoline) to regular market gasoline. JA___ n.23; EPA Guidance Letter, VPCD-97-01 at 2 (Jan. 24, 1997), https://tinyurl.com/4wt263sj. But this requirement doesn't apply if the vehicle is "marketed as requiring higher octane fuel." JA___. Because the Acura was not "labeled by the manufacturer as requiring premium fuel,"

EPA deemed the Acura's octane sensitivity "unexpected" and excluded the data from its analysis. JA___.

EPA's excuse for dropping the Acura doesn't hold water. As EPA explained, "some marginal impacts of … octane change" on fuel economy *are* expected and "roll[ed] up" into $R_a$. JA___. And although EPA *implies* that octane effects on the Acura's fuel economy were particularly large—more than three percent—the agency didn't actually calculate the change in fuel economy (or at least didn't present any calculations) using premium E10. Based on EPA's data, experts at the Alliance estimated that the Acura's fuel economy using regular E10 "was only about 0.15 to 0.20 percent lower than" when using premium E10. JA___. This is well-within the margin to which manufacturers attest, and so can hardly be "unexpected." *See* EPA Guidance Letter, VPCD-97-01 at 2. EPA never responded to the Alliance's comment. And in any event, since EPA intends to use the $R_a$ for premium-required vehicles too, which are designed for higher-octane fuel, it is unclear why sensitivity to octane should matter at all.

***Improperly including the malfunctioning Malibu 1.*** Although EPA excluded the Acura with a high $R_a$ and fretted about insubstantial

octane sensitivities, it had no qualms about including a malfunctioning vehicle—Malibu 1—with an extremely low $R_a$. JA___–__, ___, ___, ___–___. This vehicle should not have been included in a serious study. Commenters showed that, under multiple statistical tests, the Malibu 1 data is likely a statistical outlier. JA___ (interquartile range test); JA___–___ (Grubbs test). Malibu 1 appears on the very far left of this outlier chart:



**$R_a$ – Interquartile Range Test**

Outliers require close scrutiny. "[P]articularly with small datasets, a few unusually large or small observations may have too much influence" on the average. Reference Manual on Scientific Evidence, *supra* at 238. The Malibu 1 data should have been subject to further scrutiny to ensure the data was reliable. *Cf. id.* 227–28 (measurement accuracy requires reliability).

EPA's own report suggests the Malibu 1 data is unreliable. Malibu 1's highway cycle tests were particularly problematic. Unlike other vehicles, Malibu 1 repeatedly exhibited "accelerator fault code[s]" during the highway cycle tests when operating on the indolene test fuel, "with a message indicating reduced engine power." JA___. The Alliance explained that this can affect fuel economy through increased transmission line pressure and changes in transmission shift points. JA___. Because this fault code came up only when using indolene during the highway cycle, it introduced a bias in the data. According to the Alliance, "[u]nder normal certification test protocols," these test runs "would be invalidated." *Id.*

EPA claimed that the accelerator fault codes indicating reduced engine power were "not sufficient grounds to exclude" the Malibu 1 data, JA___, but other data disparities also sound proverbial alarm bells. Malibu 1's highway cycle fuel economy data was "conspicuous for the [large] size of its standard deviations, particularly on the [indolene] fuel." JA___. Malibu 1 also had the largest error in the highway cycle fuel economy difference calculations, and it was the only vehicle whose highway cycle fuel economy difference was not statistically "significant."

JA___–__ & Table 4.2.2. Moreover, Malibu 1 was among a handful of vehicles whose drive quality statistics—which indicate whether "the tests were driven in a repeatable manner"—"show[ed] larger differences" for the highway cycle tests. JA___. These differences were "especially" large for Malibu 1, suggesting unusual variability in Malibu 1's test runs.[6] *Id.* Malibu 1 was also the *only* vehicle for which the original R-factor of 0.6— based on open-loop engines that couldn't fully adjust to the change in fuel—*overestimated* the 1975 fuel economy when using E10. JA___ & Table IV-2 (compare Tier 2, R=0.6 values to Tier 3, R=0.6 values).

The only rational inference to draw from Malibu 1's outlier data, repeated faults, "conspicuous[ly]" large standard deviation in highway cycle fuel economy, "especially" large variability in drive quality data, and unusually small highway cycle fuel economy difference, is that the Malibu 1 data is unreliable and should be excluded. JA___–__, ___–__, ___–___; *see generally Mississippi v. EPA*, 744 F.3d 1334, 1352 (D.C. Cir.

---

[6] EPA stated that "some differences in drive characteristics" were expected because some of Malibu 1's highway cycles "were rerun with a different driver." JA___. But Malibu 1's drive statistics show significantly larger differences than other vehicles that were also rerun with a different driver, *id.*, and so that alone cannot account for Malibu 1's variability.

2013) (citing "the inviolable law of data analysis, 'garbage in; garbage out.'").

But EPA didn't discuss Malibu 1's extremely low change in highway cycle fuel economy and other data anomalies in its $R_a$ analysis. And in response to comments suggesting Malibu 1 was an outlier, EPA said only that the "decision to include data from [Malibu 1] was based on its performance being within the expected range." JA___. It is unclear why EPA "expected" the malfunctioning Malibu 1's outlier response. But even so, whether data conforms to the tester's *expectations* does nothing to explain why it is scientifically reliable.

*** 

EPA's decision to include unreliable, outlier data from the malfunctioning Malibu 1 and exclude reliable, if "unexpected," data from the Acura defies sound data analysis principles and is a "clear error of judgment." *State Farm*, 463 U.S. at 43. EPA also failed to provide a "reasoned response" to commenters' concerns over the reliability of Malibu 1's data, *Ohio*, 144 S. Ct. at 2054, or a "satisfactory explanation" why the Acura's slight fuel economy sensitivity to octane, even if

unexpected, disqualifies it. *State Farm*, 463 U.S. at 43. EPA's failure to explain its biased analysis was arbitrary and capricious. *Id*.

These errors are prejudicial and warrant a remand. Commenters estimated that excluding Malibu 1 (and analyzing the remaining nine vehicles) would increase EPA's $R_a$ factor to 0.86, while further including the Acura would increase EPA's $R_a$ factor to 0.90. JA___, ___, ___, ___, ___–__.

## C. EPA Arbitrarily Rejected Alternatives Without Adequate Explanation

Commenters offered EPA several alternatives—including using manufacturer certification data or values from published studies—that would avoid the Test Program's flaws. EPA's failure to adequately explain why it rejected these "'significant[,] … viable' and 'obvious' alternatives" was also arbitrary and capricious. *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 724 (5th Cir. 2013) (quoting *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013)).

One obvious alternative is using certification data provided by manfuacturers. EPA used manufacturer data to determine the original R-factor in the 1980s. *See* 50 Fed. Reg. at 27,179 (basing R-factor value of 0.6 on data from GM and Ford). And in its 2014 final rule setting the

Tier 3 E10 test fuel, EPA indicated it would use "emission test data generated by … early Tier3/LEV III vehicles covering both Tier 2 and Tier 3 test fuel" to "assess the 'R' value." 79 Fed. Reg. at 23,532. That data, said EPA, would be "instrumental in developing any appropriate adjustments to maintain equivalent stringency for the CAFE … standards." *Id.*; *see also* Tier 3 Response to Comments at 4-347 (interim requirement for manufacturers to meet standards with different fuels will "ensure that the data needed to make the test procedure adjustments based on E0 and E10 emission test data on Tier 3 technology vehicles is available in a timely manner").

But by 2020, EPA preferred to use data from its own Test Program, which the agency said better controlled for "vehicle test-to-test variability" than manufacturer data. JA___–__, Table III-1. Nevertheless, EPA requested "comments on ways that manufacturer certification data submitted to EPA, or any other data, might be used as an appropriate supplemental or alternative source of data." JA___.

The Alliance responded by providing "paired" certification data collected from automobile manufacturers. JA___–__, ___–__, ___–__. The data was generated from vehicles from model years 2016 through 2021,

and included measured vehicle fuel economy using both indolene and E10 test fuels—precisely the data EPA previously said would be used to determine $R_a$. JA___, ___–__; 79 Fed. Reg. at 23,532. Analysis of data from 95 vehicles showed the average $R_a$ factor was "much closer to … 1.0." JA___.

The Alliance also disputed EPA's suggestion that manufacturer certification data didn't sufficiently control for test-to-test variability, observing that EPA "underestimate[s] the care that is taken in doing certification testing" and that EPA's concerns were based on information that was "not up to date." *Id.* The Alliance explained that "certification testing … occur[s] under stringently regulated ambient temperatures, times between testing, [and] closely monitored variability in results." *Id.* Although some test-to-test variability is "unavoidable," the Alliance explained that through its large data set, any "variability is statistically overcome." *Id.*

Despite asking for comments, EPA failed to respond. EPA did not address whether the offered certification data was a suitable alternative, or whether the agency credited manufacturer's explanation of the care taken by laboratories during certification. Nor did EPA state whether

tests on a large number of vehicles could overcome concerns related to test-to-test variability, as the Alliance asserted. EPA also didn't explain why its $R_a$ factor of 0.81 diverged so considerably from the value obtained from certification data on more modern vehicles. An agency cannot "ask for—and then ignore—already-existing data it did not want to consider." *Chamber of Commerce of the United States v. SEC*, 85 F.4th 760, 775–76 (5th Cir. 2023).

Commenters also suggested that EPA use data from published studies to determine $R_a$. *See, e.g.*, JA___–__, ___. EPA sponsored or participated in at least three studies that generated data that could be used to determine the R-factor of automobiles operating on gasoline-ethanol fuel blends. *See* JA___–__ (published analysis discussing the studies). These studies are not perfect, but they are better than EPA's Test Program.

Analysis of these studies' data by EPA and Department of Energy staff found average R-factors ranging from 0.86 to 0.96, all considerably higher than EPA's $R_a$ of 0.81. JA___–__. Data from the study most analogous to EPA's tests—the "Catalyst Durability Study," which used the same city drive cycle used in EPA's Test Program—indicated an R-

factor value of approximately $0.95 \pm 0.04$ for the Tier 2 fleet. JA___. Some commenters recommended that EPA select a value for $R_a$ based on this study. JA___–__.

These published studies tested older vehicles that were not Tier 3-certified. But in that respect, they are no different than EPA's Test Program. And these studies evaluated many more vehicles and test fuel blends than EPA did, and so could determine a fleetwide R-factor with more certainty than EPA's grab-whatever's-at-hand approach. JA___–__, ___–__.

EPA, however, rejected this alternative. Citing the published analysis, EPA responded:

> we want to clarify that R-factor values in the literature (e.g., in Sluder, *et al.*) are generally intended to isolate the actual sensitivity of fuel economy to fuel energy content, while the $R_a$ factor here rolls up multiple impacts related to this specific pair of test fuels that include the energy content difference, additional charge cooling due to ethanol's heat of vaporization, and potentially some marginal impacts of the octane change. Thus, we wouldn't expect this $R_a$ value to precisely match other R-factors found in the literature. JA___.

In other words, EPA says that $R_a$ is a fudge factor, while past studies sought to isolate a true "R." That explains why EPA's $R_a$ value is an outlier, or so EPA says.

EPA's "fudge-factor" defense is a red herring. EPA re-designated the sensitivity factor "$R_a$" to account for minor changes to the fuel economy equation for E10, primarily how fuel properties are calculated. JA___. But EPA emphasized that those changes have "small impacts" on "the single new $R_a$ factor." *Id*. As a result, values of $R_a$ derived empirically using EPA's new formula don't materially differ from values of R derived using EPA's earlier formula. *Id*. Nor do empirically derived values for $R_a$ materially differ from analytically derived values of R: the Alliance showed that they were "the exact same values … for each individual test vehicle." JA___–__ (emphasis deleted). In any event, any small difference between R and $R_a$ is dwarfed by the great vehicle-to-vehicle variability in EPA's Test Program.

More fundamentally, the studies cited by commenters also don't seek to isolate the "actual sensitivity" to a change in fuel energy content. JA___. That is extremely difficult to do, as the minor effects of other changes in fuel properties on fuel economy are difficult to detect and isolate. EPA's "genera[l]" characterization of the previous literature therefore fails to identify why the specific cited studies are inappropriate for determining $R_a$, or why EPA's selected $R_a$ diverges so considerably

from their results. "EPA's failure to consider" an alternative based on the specific proposed studies "cannot be substantiated by conclusory statements" regarding studies, in general. *Texas*, 10 F.4th at 556 (quoting *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1226 (5th Cir. 1991)).

EPA's rejection of these "reasonably obvious alternatives" without sufficient explanation was arbitrary and capricious. *10 Ring Precision*, 722 F.3d at 724 (cleaned up).

## III.  Vacatur Is the Proper Remedy

EPA's Final Rule setting the $R_a$ factor to 0.81 is arbitrary and capricious. EPA's Test Program design was fatally flawed: the agency tested too few vehicles, and the wrong vehicles, to determine a fleetwide $R_a$ with reasonable accuracy. And EPA biased its results by arbitrarily excluding and including data based on unscientific "expectations." Moreover, the agency ignored better alternative data submitted in comments.

Any one of these errors, alone, requires vacatur, the ordinary remedy. But combined together, the remedial path is clear. *See Standing Rock Sioux Tribe v. U. S. Army Corps of Engineers*, 985 F.3d 1032, 1051 (D.C. Cir. 2021). Given EPA's utter failure to explain its changed views

or to grapple with multiple, and likely fatal, scientific criticisms, the Court must vacate 40 C.F.R. § 600.113-12 insofar as it governs vehicle fuel economy test procedures, and remand the rule so that EPA can promulgate an accurate adjustment. The "requirement for an agency to respond to significant issues raised by public comments would be utterly toothless if it could ignore comments like those presented here." *Mexican Gulf Fishing Co.*, 60 F.4th at 972.

## CONCLUSION

For the foregoing reasons, the Court should declare that EPA's Final Rule is unlawful. The Court should vacate and remand the challenged regulation.

August 16, 2024                              Respectfully submitted,

<u>/s/ James R. Conde</u>
Michael Buschbacher
R. Trent McCotter
James R. Conde
 *Counsel of Record*
Laura B. Ruppalt
BOYDEN GRAY PLLC
801 17th Street NW., Suite 350
Washington, DC 20006
(646) 266-4011
jconde@boydengray.com
*Counsel for Petitioner*

64

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic service are being served today with a copy of this document via the Court's CM/ECF. All parties in this case are represented by counsel consenting to electronic service.

August 16, 2024

Respectfully submitted,

/s/ James R. Conde
BOYDEN GRAY PLLC
801 17th Street NW., Suite 350
Washington, DC 20006
(202) 955-0620

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fifth Circuit Rule 32 and Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,951 words, excluding the portions exempted by Rule 32(f).

This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook and 14-point font.

August 16, 2024                                    Respectfully submitted,

                                                   /s/ James R. Conde
                                                   BOYDEN GRAY PLLC
                                                   801 17th Street NW., Suite 350
                                                   Washington, DC 20006
                                                   (202) 955-0620