No. 24-60209

# In the United States Court of Appeals for the Fifth Circuit

**TEXAS CORN PRODUCERS; TEXAS SORGHUM PRODUCERS; NATIONAL SORGHUM PRODUCERS; TEXAS FOOD & FUEL ASSOCIATION,**
*Petitioners,*

**v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, *in his official capacity as the Administrator of the United States Environmental Protection Agency*,**
*Respondents.*

On Petition for Review of a Rule of the
U.S. Environmental Protection Agency

## REPLY BRIEF FOR PETITIONERS

Michael Buschbacher
R. Trent McCotter
James R. Conde
  *Counsel of Record*
Laura B. Ruppalt*
BOYDEN GRAY PLLC
800 Connecticut Ave. NW,
Suite 900
Washington, DC 20006
jconde@boydengray.com
(202) 955-0620
*Counsel for Petitioners*

*Admitted only in Virginia; practice limited to matters before federal agencies and federal courts.

# TABLE OF CONTENTS

INTRODUCTION ................................................................. 1

ARGUMENT .................................................................... 3

    I.   Petitioners Have Standing ....................................... 3

        A.   Petitioners' Members Are An "Object" of EPA's Rule ... 4

        B.   EPA's Standing Objections Lack Merit ........................ 6

            1.   EPA's Inadequate Fuel-Economy Adjustment Reduces Demand for Automobile Gasoline .............. 7

            2.   EPA's Inadequate Fuel-Economy Adjustment Directly Causes Petitioners' Injuries ..................... 17

            3.   Petitioners' Injuries Are Redressable ..................... 19

            4.   Petitioners Need Not Identify Injured Members by Name .................................................. 21

    II.   EPA's $R_a$ Sensitivity Factor Is Arbitrary ............................ 22

        A.   EPA's $R_a$ Is Unreasonably Explained ......................... 23

        B.   EPA's $R_a$ Is Unreasonable .......................................... 24

    III.   Vacatur Is the Proper Remedy .................................. 28

        A.   Remand Would Be Pointless ..................................... 30

        B.   Vacatur Need Not Be Disruptive ............................... 31

CONCLUSION ................................................................ 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chamber of Com. of U.S. v. SEC*,
    85 F.4th 760 (5th Cir. 2023) ................................................. 30

*Chamber of Com. of U.S. v. SEC*,
    88 F.4th 1115 (5th Cir. 2023) ........................................ 29, 30

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .............................................................. 16

*Clarke v. CFTC*,
    74 F.4th 627 (5th Cir. 2023) ................................................. 24

*Contender Farms, L.L.P. v. USDA*,
    779 F.3d 258 (5th Cir. 2015) ................................................. 20

*In re Core Commc'ns, Inc.*,
    531 F.3d 849 (D.C. Cir. 2008) ........................................ 29, 33

*Ctr. for Auto Safety v. NHTSA*,
    793 F.2d 1322 (D.C. Cir. 1986) ........................................... 12

*Data Mktg. P'ship, LP v. DOL*,
    45 F.4th 846 (5th Cir. 2022) ........................................... 28, 29

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) .......................................................... 6, 16

*Dep't of Educ. v. Brown*,
    600 U.S. 551 (2023) .............................................................. 20

*EME Homer City Generation, L.P. v. EPA*,
    795 F.3d 118 (D.C. Cir. 2015) ............................................. 29

*Energy Future Coal. v. EPA*
    793 F.3d 141 (D.C. Cir. 2015) ....................................... 3, 4, 5

ii

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021)................................................................22

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC)*,
    *Inc.*, 528 U.S. 167 (2000)......................................... 12, 19, 20

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)................................................................20

*Mexican Gulf Fishing Co. v. Dep't of Com.*,
    60 F.4th 956 (5th Cir. 2023) .................................................23

*Nat'l Ass'n for Gun Rts., Inc. v. Garland*,
    741 F. Supp. 3d 568 (N.D. Tex. 2024)................................29

*Nat'l Ass'n of Priv. Fund Managers v. SEC*,
    103 F.4th 1097 (5th Cir. 2024) .............................................21

*Nat'l Infusion Ctr. Ass'n v. Becerra*,
    116 F.4th 488 (5th Cir. 2024) ...............................................16

*NRDC v. EPA*,
    489 F.3d 1250 (D.C. Cir. 2007) ...........................................33

*NRDC v. NHTSA*,
    894 F.3d 95 (2d Cir. 2018) ............................................... 6, 12

*Proctor & Gamble Co. v. Amway Corp.*,
    376 F.3d 496 (5th Cir. 2004)................................................26

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)................................................................16

*Teton Historic Aviation Found. v. DOD*,
    785 F.3d 719 (D.C. Cir. 2015) .............................................19

*Tex. Ass'n of Mfrs. v. Consumer Prod. Safety Comm'n*,
    989 F.3d 368 (5th Cir. 2021).................................................17

*Tex. Med. Ass'n v. HHS*,
    110 F.4th 762 (5th Cir. 2024) ...............................................29

*Texas v. United States,*
126 F.4th 392 (5th Cir. 2025) ............................................. 20

*Thole v. U.S. Bank N.A.,*
590 U.S. 538 (2020) ............................................................ 3

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) .......................................................... 18

*United Food & Com. Workers Union Loc. 751 v. Brown Grp.,
Inc.*, 517 U.S. 544 (1996) ................................................. 22

*Wickard v. Filburn,*
317 U.S. 111 (1942) .......................................................... 21

*Young Conservatives of Tex. Found. v. Smatresk,*
73 F.4th 304 (5th Cir. 2023) ............................................ 16

**Statutes**

5 U.S.C. § 706(2) ................................................................... 28

49 U.S.C. § 32901(a)(11) ......................................................... 7

49 U.S.C. § 32901(a)(16) ....................................................... 31

49 U.S.C. § 32902(a) ........................................................... 4, 7

49 U.S.C. § 32904(c) ............................................................... 3

49 U.S.C. § 32909(a)(1) ........................................................... 6

49 U.S.C. § 32912(e) ............................................................. 12

**Other Authorities**

40 C.F.R. § 600.113-12(o)(1) ........................................... 28, 34

49 C.F.R. pts. 531, 533 ........................................................... 7

49 C.F.R. § 531.5(c) ............................................................. 13

49 C.F.R. § 533.5(a) ............................................................. 13

51 Fed. Reg. 37,844 (Oct. 24, 1986)..........................................................27

75 Fed. Reg. 25,324 (May 7, 2010) ..........................................................14

79 Fed. Reg. 23,414 (Apr. 28, 2014) ........................................................31

89 Fed. Reg. 52,540 (June 24, 2024) .......................8, 9, 10, 11, 13, 15, 19

EPA & NHTSA, EPA-420-D-16-900, *Joint Draft Technical
Assessment Report* (July 2016), https://perma.cc/SET9-
J4DB...........................................................................................................14

EPA, EPA-420-R-23-033, *The 2023 Automotive Trends
Report* (Dec. 2023), https://perma.cc/ES9T-2UVT...............................31

EPA, *Gas Guzzler Tax*, https://perma.cc/JCJ8-ZW6S (last
updated Oct. 16, 2024).............................................................................16

EPA Guidance Letter CD-95-09 (June 1, 1995),
https://tinyurl.com/4s26ytww ..................................................................25

Nat'l Acads., *Cost, Effectiveness, and Deployment of Fuel
Economy Technologies for Light-Duty Vehicles* (2015),
https://doi.org/10.17226/21744................................................................13

NHTSA, *CAFE Model Documentation for 2024 FRM*
(June 2024), NHTSA-2023-0022-63262................................................10

NHTSA, *Final Environmental Impact Statement* (June
2024), https://perma.cc/XW26-XWNS......................................................9

Steven D. Levitt & Stephen J. Dubner, *Freakonomics* (2005) ...............12

*TFFA*, https://www.tffa.com/#..................................................................22

# INTRODUCTION

EPA's response all but concedes that its Final Rule is unreasonable and unreasonably explained. The agency "acknowledges that it did not fully respond to specific comments on the proposal." EPA Br. 29. And "[i]n response to the Petition for Review, EPA [has] decided to reconsider its decision that the $R_a$ factor should be set at 0.81." ECF 46-2 ¶ 14 (First Dunham Declaration). EPA now avers that it is running a new study to support a new rulemaking effort, using "50 to 100 vehicles" from "current and future model year[s]," instead of only 10, old vehicles. *Id.* ¶¶ 15–16. Although EPA still stubbornly refuses to "concede" error, *id.* ¶ 14, actions speak louder than briefs. So does EPA's silence. EPA still has no real answer to Petitioners' arguments that EPA tested too few vehicles; tested old, unrepresentative vehicles; biased its analysis by arbitrarily excluding and including data; and unreasonably ignored better alternative data. *See* Opening Br. 39–63.

Petitioners welcome EPA's epiphany. But it comes too late to save the Final Rule. Commenters raised the same issues in response to EPA's 2020 proposal, and again in response to EPA's 2023 proposal. JA039–46, 126–86, 199–280. Both times, EPA ignored them. Brushing past

criticisms, EPA promulgated an unreasonably low $R_a$ "sensitivity factor" that does not adequately adjust fuel economy to account for the new test fuel, leaving Petitioners with no choice except to seek relief in this Court.

Sensing a judicial rebuke at hand, and with little to say on the merits, EPA desperately seeks to avoid judicial review altogether. EPA first sought a "voluntary" remand without conceding the merits. This Court denied EPA's ploy. ECF 61. EPA now attacks Petitioners' Article III standing. EPA Br. 17–29. But EPA's arguments don't hold water. As targets of the fuel economy program and the gas guzzler tax, Petitioners' members have standing to challenge an allegedly inadequate fuel-economy adjustment. EPA admits that an unreasonably low $R_a$ factor increases the stringency of fuel economy standards. *Id*. at 21. This will predictably decrease domestic demand for gasoline. Petitioners' members are businesses that depend upon sales of gasoline: when automobile gasoline use falls, so do their revenues—a classic pocketbook injury.

In the alternative, EPA argues against meaningful remedies. This Court should again reject EPA's call for an open-ended remand without vacatur. *Id*. at 33–41. Such a remand is a bureaucrat's dream, allowing an agency to indefinitely ignore court decisions. It is reserved for minor

procedural infractions that an agency can quickly correct. That's not the case here. EPA's intention to undertake an entirely new test program effectively concedes that the agency cannot defend the Final Rule. First Dunham Declaration ¶¶ 14–16. Remanding without vacatur would simply encourage more delay. Vacatur is the appropriate remedy.

## ARGUMENT

### I.   Petitioners Have Standing

EPA tries to "make standing law more complicated than it needs to be." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 547 (2020). But "[t]he standing question in this case is straightforward." *Energy Future Coal. v. EPA* 793 F.3d 141, 144 (D.C. Cir. 2015) (Kavanaugh, J.).

The Corporate Average Fuel Economy (CAFE) program, which includes EPA's fuel-economy adjustment, 49 U.S.C. § 32904(c), is designed to reduce domestic fuel consumption. Petitioners are associations representing growers of corn and sorghum—raw materials used to produce the ethanol contained in automobile gasoline—and companies involved in the processing, transport, and sale of gasoline. Opening Br. 34–38. As *fuel product* manufacturers, distributors, and retailers, Petitioners' members are therefore targets of the CAFE *fuel economy* standards.

## A. Petitioners' Members Are An "Object" of EPA's Rule

EPA gets one thing right: whether "someone is in fact an object of a regulation is a flexible inquiry rooted in common sense." EPA Br. 26 (quoting *Contender Farms, L.L.P. v. USDA*, 779 F.3d 258, 265 (5th Cir. 2015)). But common sense here favors Petitioners. When "the Government prohibits or impedes Company A from using Company B's product," "both Company A and Company B are 'an object of the action … at issue,' so 'there is ordinarily little question' that they have standing." *Energy Future Coal.*, 793 F.3d at 144 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992)). In other words, when a regulation imposes "a regulatory hurdle" on the use of a product, a seller of that product, as an object of the regulation, obviously has standing to challenge it. *Id.*

Petitioners' members fit that description. The CAFE program regulates the fuel efficiency of automobiles. 49 U.S.C. § 32902(a). The members of Texas Corn Producers, Texas Sorghum Producers, and National Sorghum Producers sell products—corn and sorghum crops—used to make a necessary component of finished gasoline. ECF 34-4 ¶¶ 2–3, 10–12 (Gibson Declaration); ECF 34-5 ¶¶ 2–4, 11–13 (Lust Declaration); ECF 34-6 ¶¶ 2–4, 11–13 (Cleveland Declaration). Similarly, the members

of the Texas Food & Fuel Association (TFFA) sell and distribute billions of gallons of gasoline and diesel annually. ECF 34-3 ¶¶ 2–3 (Hardin Declaration). EPA's inadequate fuel-economy adjustment makes the fuel economy standards more stringent and so reduces domestic demand for automobile gasoline, thus creating a "regulatory hurdle" that "impedes … us[e]" of these members' "product[s]." *Energy Future Coal.*, 793 F.3d at 144. Petitioners' members are therefore "an object of" EPA's Final Rule and have standing to challenge it. *Id.*

Petitioners don't need to "identify any part of the $R_a$ Action that regulates their members" directly. EPA Br. 26. By increasing the stringency of CAFE, EPA's inadequate fuel-economy adjustment "is a direct regulatory impediment" to the use of Petitioners' products in the marketplace. *Energy Future Coal.*, 793 F.3d at 144. That the Final Rule "is technically directed at vehicle manufacturers, not [corn and sorghum] producers … does not undermine petitioners' standing." *Id.* Nor does it matter that EPA has not "directly prohibited vehicle manufacturers from using" Petitioners' members' products. EPA Br. 27. It is enough that EPA's $R_a$ "makes it harder for [Petitioners' members] to sell" their products by reducing demand for them. *Energy Future Coal.*, 793 F.3d at 144.

Persons other than automakers may be "adversely affected" by test-procedure adjustments and may sue. 49 U.S.C. § 32909(a)(1). Using common sense and basic economics, courts routinely find that petitioners other than automakers have standing to challenge fuel economy standards and related rulemakings. *See, e.g.*, *NRDC v. NHTSA*, 894 F.3d 95, 104–05 (2d Cir. 2018) (environmental groups have standing to challenge temporary delay in inflation adjustment for CAFE fines). Surely, if environmental groups may challenge actions making the fuel economy standards less stringent, *id.*, sellers of fuel—the product targeted by the regulatory program—have standing to challenge actions making the fuel economy standards more stringent.

## B.    EPA's Standing Objections Lack Merit

Petitioners' members are an object of the Final Rule, so their standing is self-evident. Nonetheless, Petitioners' members' injury is also supported by the evidence, including the government's predictive model. Petitioners must only show that there's a "substantial risk" their members will suffer harm through the "predictable effect of Government action on the decisions of third parties"—here, automakers. *Dep't of Com. v. New*

*York*, 588 U.S. 752, 767–68 (2019). Petitioners easily satisfy this standard.

### 1. EPA's Inadequate Fuel-Economy Adjustment Reduces Demand for Automobile Gasoline

EPA acknowledges that an $R_a$ sensitivity factor that's too low increases the stringency of the fuel economy standards. EPA Br. 21. But EPA now apparently considers it "speculative" to think that more stringent fuel economy standards will increase fuel economy. *Id.* at 20–24. This "*que sais-je?*" might please a Pyrrhonian skeptic, but it defies common sense and evidence—and, if true, would undermine the rationale for the CAFE program altogether.

"Fuel economy" measures "the average number of miles traveled by an automobile for each gallon of gasoline ... used." 49 U.S.C. § 32901(a)(11). By definition, when an automobile's fuel economy increases, the number of gallons of gasoline (or diesel) it consumes to travel a particular number of miles decreases. In CAFE, the National Highway Traffic and Safety Administration (NHTSA) sets "*average* fuel economy standards," *id.* § 32902(a) (emphasis added), which apply separately to a manufacturer's fleet of passenger cars and fleet of light trucks, 49 C.F.R. pts. 531, 533. Therefore, to comply with a more stringent average fuel

economy standard, a manufacturer's fleet of passenger cars or light trucks must consume less gasoline per mile than it would under a less stringent standard.

Reducing fuel use is thus the point of the CAFE program, which—after all—was enacted in response to the price shocks of the Arab Oil Embargos of the 1970s. As NHTSA has explained, "raising CAFE … standard stringency" "improve[s] energy conservation" and "helps consumers save money on fuel"—because automobiles need less fuel to travel a given distance. 89 Fed. Reg. 52,540, 52,545 (June 24, 2024). NHTSA regularly concludes that more stringent fuel economy standards reduce domestic gasoline use. For example, NHTSA determined that its most recent CAFE standards "will reduce gasoline consumption by 64 billion gallons relative to [less stringent] reference baseline" standards. *Id.* Unsurprisingly, more stringent fuel economy standards decrease fuel consumption. That's the point.

EPA speculates that more stringent fuel economy standards might not decrease fuel consumption here because the increase in stringency is allegedly "small," and manufacturers might respond in other ways. EPA

Br. 21.[1] Specifically, EPA theorizes that manufacturers may violate the law and pay fines, use existing credits, or adjust the mix of vehicles they produce. EPA Br. 21–22. But EPA's conjecture contradicts the government's predictive model, which shows that automakers respond to more stringent fuel economy standards—including at the levels induced by EPA's adjustment—by increasing fuel economy, thus predictably reducing domestic demand for gasoline.

To evaluate the effects of different CAFE standards, NHTSA uses the CAFE Compliance and Effects Modeling System (CAFE Model). ECF 34-2 ¶ 3 (Myers Declaration). The CAFE Model predicts how automakers will respond to changes in fuel economy standards and how that response will affect fuel consumption and other factors, *id.*, "tak[ing] into account many past, present, and reasonably foreseeable future actions that affect U.S. transportation sector fuel use," NHTSA, *Final Environmental Impact Statement* S-8 (June 2024), https://perma.cc/XW26-XWNS (Final EIS); *see also* 89 Fed. Reg. at 52,580. Government experts regularly

---

[1] The effect isn't "small." EPA's $R_a$ factor of 0.81 will underestimate fuel economy by approximately 0.3 mpg. *See* Opening Br. 33 n.2, *accord* EPA Br. 7 & n.1. For a fleet of 16 million vehicles, that could cost close to a billion dollars in fines. *See* Opening Br. 33 n.2 ($5.1 million for every 100,000 automobiles produced).

update and improve the Model. The last update was released in June 2024 and was used by NHTSA to justify its most recent CAFE rulemaking. NHTSA, *CAFE Model Documentation for 2024 FRM* 1–3 (June 2024), NHTSA-2023-0022-63262 (Model Documentation); 89 Fed. Reg. at 52,570.

Using this Model, Petitioners' expert, Dr. Myers, shows that EPA's fuel-economy adjustment will decrease domestic demand for automobile gasoline by millions of gallons. Myers Declaration ¶¶ 9–13. EPA hasn't challenged Dr. Myers's conclusions or disputed the reliability of the CAFE Model. Instead, EPA characterizes the declaration as "conclusory allegations" and theorizes about possible automaker responses other than increasing fuel economy. EPA Br. 28.

There are serious problems with EPA's arm-chair theories. For one, the CAFE Model used by Dr. Myers already accounts for two of the three automaker responses that EPA speculates about. First, the CAFE Model recognizes that automakers may be willing to incur civil penalties rather than improve fuel economy when it is more cost-effective to do so. Model Documentation 82. The Model's inputs generally assume that "all manufacturers [a]re willing to pay fines in [model years] 2022–2026," and that

for model years 2027 and beyond, "manufacturers that had historically paid fines would continue" to do so. 89 Fed. Reg. at 52,598.

Second, Dr. Myers ran the CAFE Model in the "Environmental Impact Statement" mode, which "maximally simulates the real world." Myers Declaration ¶ 10. NHTSA uses this mode to evaluate the "real-world" consequences of CAFE standards. Final EIS 2-21. When run in this mode, the CAFE Model accounts for the use of accumulated overcompliance credits. *Id.*; Myers Declaration ¶ 10; Model Documentation 70–72. To do so, the Model's inputs "include estimated CAFE compliance credit banks for each manufacturer." 89 Fed. Reg. at 52,598. So, the CAFE Model shows that after considering credits and fines, EPA's $R_a$ factor will still decrease domestic demand for automobile gasoline—and thus depress demand for Petitioners' products—presumably because these alternatives are less cost-effective than improving fuel economy. Myers Declaration ¶¶ 9–13.

Moreover, EPA's theory only underscores the likelihood of injury. A rule that causes automakers to incur fines or depletes credits still predictably encourages fuel-efficiency technologies, making the risk of injury likely. As the Supreme Court has "recognized on numerous occasions,"

"civil penalties … deter future violations." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). They have the "potential to affect automakers' business decisions and compliance approaches." *NRDC*, 894 F.3d at 105; *see also Ctr. for Auto Safety v. NHTSA*, 793 F.2d 1322, 1333–35 (D.C. Cir. 1986) (carryover credits and possibility of fines made challenge to past fuel economy standards a live controversy); *see also cf.* 49 U.S.C. § 32912(e) (providing that, subject to appropriations, CAFE penalties must be invested in further regulating fuel economy and producing "advanced technology vehicles" with greater fuel economy).

Third, EPA theorizes that more stringent fuel economy standards may actually *"benefit"* Petitioners' members by *decreasing* fuel economy. EPA Br. 24. Unlike the unintended consequences described in popular books such as *Freakonomics*,[2] however, the data doesn't bear out this counterintuitive assertion.

A smaller vehicle tends to be more fuel-efficient because it needs less energy to propel itself. To discourage automakers from complying with the standards by producing smaller vehicles instead of more

---

[2] Steven D. Levitt & Stephen J. Dubner, *Freakonomics* (2005).

efficient ones, NHTSA adjusts its standards by vehicle size or "footprint" (roughly, the rectangle between the wheels measured from the point where the tires touch the ground). EPA Br. 4–5; 89 Fed. Reg. at 52,585. Up to a certain threshold, larger vehicles have a lower fuel economy target, so making larger vehicles reduces an automaker's production-weighted fleet-average standard. *See* 49 C.F.R. §§ 531.5(c), 533.5(a); 89 Fed. Reg. 52,567–68. Here is an illustrative example of a "footprint" and what the targets look like:



Nat'l Acads., *Cost, Effectiveness, and Deployment of Fuel Economy Technologies for Light-Duty Vehicles* 16, Figure 1.1 (2015), https://doi.org/10.17226/21744.

EPA implies that NHTSA's footprint-based targets operate as a loophole that automakers can use to evade more stringent standards. This ignores, however, that NTHSA calibrates the footprint-based targets to discourage upsizing, as well as downsizing. As EPA and NHTSA have explained, the footprint-based-target curves are fitted based upon an empirical relationship between automobile fuel economy and size that aims to eliminate the "incentive to increase vehicle size" in response to more stringent standards. 75 Fed. Reg. 25,324, 25,604 (May 7, 2010). "[T]he shape of the footprint curves themselves is approximately 'footprint-neutral,' that is, that it should neither encourage manufacturers to increase the footprint of their fleets, nor to decrease it." EPA & NHTSA, EPA-420-D-16-900, *Joint Draft Technical Assessment Report* 8-2 (July 2016), https://perma.cc/SET9-J4DB. In others word, as both EPA and NHTSA have repeatedly explained, the fuel economy targets are carefully designed to discourage precisely the effect that EPA now speculates about.

Although upsizing in response to the standards is theoretically possible if NHTSA gets the shape of the curves wrong, NHTSA has recently reaffirmed that automakers *aren't* responding to more stringent

standards by increasing the size of passenger cars or light trucks. Despite the vastly increased stringency of CAFE standards and far higher fuel economy, "vehicle footprint size, by vehicle category, has in fact changed very little over the last decade," which is why NHTSA has kept footprint-based standards. 89 Fed. Reg. at 52,590. The relevant expert agency—NHTSA, not EPA—has therefore concluded that "automakers do not behave the way" EPA now conveniently speculates they could. EPA Br. 24.

This *Freakonomics* theory is also beside the point. Even if an automaker increased the size of the automobiles it sold, the harm would remain: the automaker's new fleet would still have to satisfy an average fuel economy standard that is effectively more stringent than it should be using an accurate (higher) $R_a$ factor, so total fuel consumption would still be lower.

The gas guzzler tax doesn't depend upon vehicle size, nor can automakers use credits to avoid it. So EPA's left arguing that manufacturers will simply pay the tax rather than improve fuel economy. *See* EPA Br. 22. But even if an automaker chooses to pay, at least some of that tax will be predictably passed onto consumers in the form of higher purchase prices, resulting in fewer gas guzzlers bought—and so, less gas being

guzzled. After all, the point of the tax is "to discourage the production *and purchase* of fuel-inefficient vehicles." EPA, *Gas Guzzler Tax*, https://perma.cc/JCJ8-ZW6S (last updated Oct. 16, 2024) (emphasis added). That the number of guzzlers affected may be small relative to the size of the entire automobile fleet, EPA Br. 23, doesn't matter. An "economic injury … need not measure more than an identifiable trifle" to confer standing. *Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 309 (5th Cir. 2023) (cleaned up).

EPA's claim that Petitioners injuries aren't "certainly impending" appears to misunderstand the showing of "imminence" necessary for injury-in-fact. EPA Br. 18, 23 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)). Imminence doesn't require "demonstrat[ing] that it is literally certain that the harms they identify will come about," as opposed to a "substantial risk of harm." *Clapper*, 568 U.S. at 414 n.5. Where, as here, the alleged injury depends upon the "predictable effect of Government action on the decisions of third parties," there is a "substantial risk" of harm and imminence is satisfied. *Dep't of Com.*, 588 U.S. at 767–68; *accord Nat'l Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 498–99 (5th Cir. 2024); *see also Susan B. Anthony List v. Driehaus*, 573 U.S.

149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is certainly impending, *or* there is a substantial risk that the harm will occur" (quotation marks omitted) (emphasis added)).

### 2. EPA's Inadequate Fuel-Economy Adjustment Directly Causes Petitioners' Injuries

EPA asserts that Petitioners rely upon a convoluted eight-step "chain of causation." EPA Br. 25. But the dots are far easier to connect: EPA's inadequate fuel-economy adjustment reduces domestic demand for automobile fuel and the ethanol used in that fuel. The members of Texas Corn Growers, Texas Sorghum Producers, and National Sorghum Producers sell ethanol feedstock in a national commodity market, so EPA's $R_a$ means lower demand—and lower prices—for their products. *See* Opening Br. 36–37; *see also Tex. Ass'n of Mfrs. v. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 377 (5th Cir. 2021) (threat of reduced sales of raw materials for regulated product is concrete, imminent injury-in-fact). Because ethanol demand affects the national market price for those crops, growers are harmed even if they don't sell to ethanol producers. *See* Gibson Declaration ¶¶ 3, 10–12; Lust Declaration ¶¶ 4, 11–13; Cleveland Declaration ¶¶ 4, 11–13. For similar reasons, reduced domestic demand for automobile gasoline from the Final Rule's effect on the gas guzzler tax

harms these Petitioners' members by depressing demand for their products, no matter where vehicles are driven. *Contra* EPA Br. 25–26.

The injury to the petroleum-marketing members of TFFA is even more direct. TFFA's members distribute and sell approximately 9 billion gallons of gasoline and diesel each year, and their revenues depend upon the number of gallons sold. Hardin Declaration ¶¶ 2–5. EPA's inadequate fuel-economy adjustment will decrease the volume of fuel these members sell. *Id.* ¶¶ 11–13. These monetary harms "readily qualify as concrete injuries under Article III." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). Other TFFA members similarly experience economic loss when gasoline sales decrease, which is the predictable effect of EPA's $R_a$. Hardin Declaration ¶¶ 2–5, 12–13; Opening Br. 34–36.

EPA implies in passing that other programs—the Bipartisan Infrastructure Law (BIL), Inflation Reduction Act (IRA), or maybe something else—may also "drive down fuel consumption." EPA Br. 27. But Dr. Myers's CAFE Model results—which, again, have not been challenged— "show that is the $R_a$ Factor, as opposed to a congressionally created program, that will drive [at least some] reductions in fuel consumption." EPA Br. 27–28; *see* Myers Declaration ¶¶ 9–13. As with credits and fines,

the CAFE model *already* accounts for these laws, so Dr. Myers's results do, too. *See* Model Documentation 3; 89 Fed. Reg. at 52,615 (Model incorporates IRA tax credits); 89 Fed. Reg. at 52,669–70 (NHTSA considered BIL incentives when determining Model inputs).

\* \* \*

EPA—not Petitioners—is piling inference upon inference to deny what common sense, basic economics, and the government's predictive model all demonstrate: increasing the stringency of fuel economy standards by underestimating automobile efficiency will predictably decrease demand for automobile gasoline across the Nation, harming Petitioners.

### 3. *Petitioners' Injuries Are Redressable*

EPA complains that "Petitioners do not offer any evidence to show that a favorable decision will redress" their injuries. EPA Br. 28. But "Article III does not demand a demonstration that victory in court will without doubt cure the identified injury." *Teton Historic Aviation Found. v. DOD*, 785 F.3d 719, 727 (D.C. Cir. 2015). It generally must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Laidlaw Env't Servs.*, 528 U.S at 181. Moreover, when, as here, petitioners assert a procedural injury, redressability is further

relaxed. *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023). Petitioners need show only "some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).

As an initial matter, the harm here stems from an agency action, so "redressability … flow[s] naturally from the injury." *Contender Farms,* 779 F.3d at 266. "[C]ausation and redressability" are "flip sides of the same coin": because EPA's "action causes [Petitioners'] injury, [vacating] the action" will "redress that injury." *Texas v. United States*, 126 F.4th 392, 407 (5th Cir. 2025). Vacating the Final Rule would eliminate, or at least mitigate, the economic harm Petitioners' members face.

There is also "some possibility" of redress on remand. *Massachusetts*, 549 U.S. at 518. Petitioners' opening brief has *already* prompted EPA to reconsider the Final Rule's approach. First Dunham Declaration ¶ 14. Given EPA's professed intent to conduct a new rulemaking that abandons flawed aspects of the Final Rule challenged here, it is "likely"— and at least possible—that the new $R_a$ factor will be closer to "1.0," mitigating Petitioners' members' injuries. *Laidlaw Env't Servs.*, 528 U.S at 181.

### 4. Petitioners Need Not Identify Injured Members by Name

Finally, EPA asserts that Petitioners must identify injured members by name to establish associational standing. EPA Br. 19–20. That's wrong. When, as here, "all the members of [an] organization are affected," Petitioners "need not identify particular members." *Nat'l Ass'n of Priv. Fund Managers v. SEC*, 103 F.4th 1097, 1109 (5th Cir. 2024).

Texas Corn Producers, Texas Sorghum Producers, and National Sorghum Producers represent growers of corn and sorghum, which are feedstocks used for the ethanol used in automobile gasoline. Gibson Declaration ¶¶ 2–3; Lust Declaration ¶¶ 2–4; Cleveland Declaration ¶¶ 2–4. Because the market price for these crops depends upon demand for ethanol, all of Petitioners' members are affected when demand decreases, even if they do not sell their crops directly for use in ethanol. *See* Gibson Declaration ¶¶ 3, 10–12; Lust Declaration ¶¶ 4, 11–13; Cleveland Declaration ¶¶ 4, 11–13; *cf. Wickard v. Filburn*, 317 U.S. 111, 128 (1942).

Similarly, "because the challenged rule targets an entire 'industry'" that TFFA represents, TFFA need not identify injured members by name. *Nat'l Ass'n of Priv. Fund Managers*, 103 F.4th at 1109. TFFA represents "businesses who process, transport, and sell refined products made from

crude oil." *TFFA*, https://www.tffa.com/# (visited Feb. 18, 2025). TFFA's members span the automobile gasoline supply chain. They include companies that sell and distribute fuel to retailers (again, 9 billion gallons of fuel each year); owners and operators of convenience stores, filling stations, and truck stops that sell automobile gasoline; and companies that supply equipment, products, or services that support the operations of fuel marketers and retailers. Hardin Declaration ¶¶ 2–5. All of these trade group members are injured when domestic demand for automobile gasoline is reduced. *Id.*; Opening Br. 34–36. There is therefore no question that "at least one member" of TFFA has standing. *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996). In any event, an injured member of TFFA is identified in a supplemental letter to the docket. ECF 81-2.

## II.  EPA's $R_a$ Sensitivity Factor Is Arbitrary

Under the Administrative Procedure Act (APA), agency decisions must be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). EPA's $R_a$ factor of 0.81 is neither. EPA has no persuasive response to any of Petitioners' arguments.

## A.  EPA's $R_a$ Is Unreasonably Explained

At a minimum, EPA violated the APA by failing to reasonably explain its Final Rule.

To satisfy the APA, an agency must address "significant points raised by the public comments." *Mexican Gulf Fishing Co. v. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023) (cleaned up). EPA "acknowledges that it did not fully respond to specific comments on the proposal." EPA Br. 29. In particular, commenters pointed out that EPA didn't test enough vehicles, tested unrepresentative vehicles, biased its analysis of the data, and unreasonably ignored alternatives. Opening Br. 39–63. These critiques, "if true" (which they are) and "if adopted, would require a change in [EPA's] proposed rule" and so are "significant" under this Court's precedent. *Mexican Gulf*, 60 F.4th at 971. Indeed, "the requirement for an agency to respond to significant issues raised by public comments would be utterly toothless if it could ignore comments like those presented here." *Id.* at 972.

EPA hasn't argued otherwise. Instead, "[i]n response" to this suit, the agency has belatedly stated it will "conduct[] a new study" that corrects the flaws that commenters raised. First Dunham Declaration

¶¶ 14–15. That confirms that the objections raised were "significant" and the error not harmless. Because the agency failed to address those objections, EPA violated the APA. *Clarke v. CFTC*, 74 F.4th 627, 641 (5th Cir. 2023).

## B.    EPA's $R_a$ Is Unreasonable

EPA's Final Rule is also unreasonable. As Petitioners explained, EPA's $R_a$ of 0.81 is substantially lower than the R-factors determined by manufacturers (based upon certification data) and published studies (based upon other test programs). Opening Br. 28–29, 57–63. These sources, which include EPA authors, have uniformly concluded that the R-factor for gasoline-ethanol blends, including E10, is closer to 1.0.[3] Opening Br. 28–29.

EPA's conclusory justifications are contradicted by the agency's admission that a new study is warranted. First Dunham Declaration ¶¶ 14–16. EPA says it selected the test vehicles because they "used a variety of engine technologies that would be used in the future." EPA Br. 30. But

---

[3] Like EPA's "$R_a$," the "R-factor" measured by manufacturers and study authors considers differences between ethanol-containing and E0 test fuels, and so the two values can be compared directly, contrary to EPA's claim that its study is unique. EPA Br. 33; *see* Opening Br. 62–63.

EPA now "agrees that vehicle technology has changed since the [prior study] was completed and that additional testing with more and newer vehicles" is warranted. First Dunham Declaration ¶ 14. EPA claims that it "can explain how and why tightly controlling sources of test-to-test variability for [10] vehicles provides reliable and sufficient data" for determining $R_a$. EPA Br. 35. But that contradicts EPA's prior statement that "a minimum of 75 to 100 … vehicles" are necessary, EPA Guidance Letter CD-95-09, at 3 (June 1, 1995), https://tinyurl.com/4s26ytww, and it is inconsistent with EPA's more recent admission that it "anticipates" testing "50 to 100 vehicles" in its new study to "provide the Agency with sufficient confidence to determine the $R_a$ factor." First Dunham Declaration ¶ 16.

Reducing test-to-test variability doesn't solve the far larger problem of vehicle-to-vehicle variability. Opening Br. 41–46. EPA's own Test Program data shows that measurements of $R_a$ vary far more between tests on *different* vehicles than they do between tests on the *same* vehicle. *See* JA099, Table 4.3.1. The wide variation in $R_a$ across different vehicles means that no matter how well EPA controls test-to-test variability for a particular vehicle, the agency risks calculating an inaccurate $R_a$ unless it tests a sufficient number of vehicles, and 10 vehicles aren't enough. *See*

Opening Br. 41–43. Regardless, EPA doesn't even try to explain how its Test Program addresses vehicle-to-vehicle variability, it just claims it could. EPA Br. 35. That assertion isn't an adequately developed argument, so EPA concedes error and fails to show that the error was harmless. *Proctor & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 n.1 (5th Cir. 2004).

EPA relatedly claims that manufacturer certification data is inadequate because manufacturers don't control test-to-test variability in the way EPA did. EPA Br. 32. But EPA ignores that the large number of vehicles tested by automakers—nearly 100—addresses the far more important problem of vehicle-to-vehicle variability and the number of tests "overcome[s] concerns related to" the far smaller problem of "test-to-test variability." Opening Br. 59–60. EPA has thus conceded that point, too.

Even now, EPA defends its data analysis only by repeating conclusory assertions and unscientific mantras: EPA excluded the Acura's data because it was "unexpected" and included the malfunctioning Malibu's data because there weren't "sufficient grounds" to exclude it. EPA Br. 32. Apart from restating these conclusions, EPA doesn't explain how it could adequately address Petitioners' critiques on remand, another forfeiture.

EPA criticizes Petitioners for endorsing studies that "examined just 16, 15, and 18 vehicles" and that tested vehicles from older model years. *Id.* at 31–32. As an initial matter, however, EPA misstates the number of vehicles tested in the Catalyst Durability Study. That study involved "18 vehicle models," but used multiple vehicles for each model. JA191, 294. For each model, two or three vehicles (all but the "E0" vehicles) were used to determine the R-factor, totaling 41 vehicles. JA293–95 & Table 2.3, 297 & Table 2.4, 298–99. This aside, Petitioners freely admit that "[t]hese studies are not perfect," but "they are better than" EPA's flawed ten-vehicle Test Program. Opening Br. 60. As Petitioners explained, these studies "evaluated many more vehicles and test fuel blends than EPA did, and so could determine a fleetwide R-factor with more certainty than EPA's grab-whatever's-at-hand approach." *Id.* at 61. EPA doesn't dispute this point. Moreover, these studies, which collectively tested over 70 vehicles, uniformly found an R-factor that was far higher than 0.81. *Id.* at 28–29, 57–63. And technological advances should tend to increase $R_a$, so these studies would, if anything, likely underestimate the $R_a$ factor for newer vehicles. *See* 51 Fed. Reg. 37,844, 37,847 (Oct. 24, 1986).

\* \* \*

EPA based its $R_a$ sensitivity factor on a flawed analysis of data from a flawed Test Program. EPA refused to consider reasonable alternatives and selected a value of 0.81 that is considerably lower than that determined by certification data and published studies, including studies by EPA authors. When commenters raised objections—twice—EPA entirely ignored them and pressed forward with its unreasonable Rule. EPA has violated the APA.

## III. Vacatur Is the Proper Remedy

The Court should vacate the relevant portions of the Final Rule and remand to EPA to promulgate a new $R_a$ sensitivity factor. Specifically, the Court should vacate 40 C.F.R. § 600.113-12(o)(1), which implements EPA's unlawful $R_a$.

The APA expressly authorizes vacatur. *Contra* EPA Br. 34. Section 706(2) of Title 5 provides that a "reviewing court shall … hold unlawful *and set aside* agency action" taken in violation of the APA. 5 U.S.C. § 706(2) (emphasis added). Section 706 "extends beyond the mere non-enforcement remedies available to courts that review the constitutionality of legislation, as it empowers courts to 'set aside'—*i.e.*, formally nullify and revoke—an unlawful agency action." *Data Mktg. P'ship, LP v. DOL*,

45 F.4th 846, 859 (5th Cir. 2022) (quoting Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 950 (2018)).

Indeed, the "*default* rule is that vacatur is the appropriate remedy." *Id.* (emphasis added); *see also Chamber of Com. of U.S. v. SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023) (*Chamber of Com. II*). For good reason. Remand *without* vacatur "creates a risk that an agency may drag its feet and keep in place an unlawful agency rule." *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015) (Kavanaugh, J.). It also "invites agency indifference," *In re Core Commc'ns, Inc.*, 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J., concurring).

EPA asks for a Mulligan that leaves its unlawful $R_a$ factor in place. EPA Br. 33–41. This Court has already once rejected that toothless remedy. ECF 61. It should do so again. "[R]emand without vacatur is available only rarely, when there is 'at least a serious possibility' that the deficiency can be corrected on remand and that vacatur would have 'disruptive consequences.'" *Tex. Med. Ass'n v. HHS*, 110 F.4th 762, 779 (5th Cir. 2024). "[B]ecause vacatur is the default remedy … defendants bear the burden to prove that vacatur is unnecessary." *Nat'l Ass'n for Gun Rts., Inc. v. Garland*, 741 F. Supp. 3d 568, 610 (N.D. Tex. 2024). EPA hasn't

met that burden, so this is not one of the "rare cases" in which remand without vacatur is justified. *Chamber of Com. II*, 88 F.4th at 1118.

## A. Remand Would Be Pointless

As explained in Part II.B, *supra*, there is no "serious possibility that [EPA] will be able to substantiate its" $R_a$ factor of 0.81 on remand. *Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 780 (5th Cir. 2023). EPA's $R_a$ is so much lower than published and automaker-calculated R-factor values, that EPA cannot credibly defend it as likely correct. EPA has already had multiple opportunities to respond to Petitioners' detailed criticisms and—tellingly—failed to do so.

EPA's recent "deci[sion] to reconsider its decision that the $R_a$ factor should be set at 0.81" shows that the Final Rule is indefensible. First Dunham Declaration ¶ 14. EPA has conceded that the Test Program was seriously defective by committing to a new test program and rulemaking in response to this lawsuit. *Id.* ¶¶ 14–16; EPA Br. 36. If EPA really could "justify its decision to set the $R_a$ factor at 0.81 if given the opportunity to do so," EPA Br. 34, then there would be no reason for EPA to undertake such an effort.

## B.     Vacatur Need Not Be Disruptive

Vacatur also need not be disruptive. Automakers must use the $R_a$ sensitivity factor when they begin using E10 for fuel economy testing, starting with model year 2027 vehicles. JA014 & Table 23. The production cycle for those vehicles starts at the beginning of calendar year 2026. *See* 49 U.S.C. § 32901(a)(16); EPA, EPA-420-R-23-033, *The 2023 Automotive Trends Report* 9 (Dec. 2023), https://perma.cc/ES9T-2UVT (explaining model years). That should be plenty of time for reassessment.

Vacatur is also necessary. *See* ECF 52, at 11–13, 26–27 (Opposition to Motion for Remand). EPA will not meet, of its own volition, a nonbinding "expect[ed]" date. First Dunham Declaration ¶ 17. Consider its delay so far. EPA ordered the switch to E10 for fuel economy back in 2014, but deferred the fuel's use so that the agency could investigate the sensitivity of modern vehicles to the change in test fuels. 79 Fed. Reg. 23,414, 23,525–26, 23,531 (Apr. 28, 2014). This delay imposed an unnecessary double-testing burden on manufacturers, with criteria pollutant emissions measured using E10 and fuel economy and greenhouse gas emissions measured using E0. EPA claimed this would "provide data

needed" to develop a sensitivity factor "in early to mid 2015." *Id.* at 23,532.

Blowing past that expected deadline and ignoring its promise to use certification data, EPA didn't propose a new sensitivity factor until May 2020, claiming "final action" was only "months away." JA064. But EPA didn't promulgate a sensitivity factor until *four years* later. JA001–15. EPA's complaints of "disruption" are rather rich given that EPA's delay, itself, has resulted in double testing for over a decade. JA054. There is no reason to believe that EPA will act any more expeditiously now if its preferred—but unlawful—$R_a$ factor remains in place while it reconsiders the Final Rule.

As when it sought a voluntary remand, EPA claims that Petitioners will not be harmed while EPA reconsiders the Rule because Petitioners will experience no injury until *model year* 2028. EPA Br. 40–41. But as Petitioners have already explained, Dr. Myers's declaration displays the decrease in cumulative gasoline consumption in a given *calendar* year, not a model year. Myers Declaration ¶ 13; Opposition to Motion for Remand 25–26. The harm to Petitioners in calendar year 2028 thus arises from all vehicles subject to EPA's inadequate fuel-economy adjustment,

which includes model year 2027 vehicles. The model year 2027 production cycle begins as early as January 2026, so Petitioners will experience harm from the Final Rule well *before* EPA's aspirational target date of December 2026 to promulgate a new Final Rule. First Dunham Declaration ¶ 18.

If the Court is concerned that vacating the $R_a$ sensitivity factor without a replacement may be too disruptive, then it could exercise equitable discretion to temporarily stay the mandate until, at the latest, November 30, 2026, consistent with EPA's professed intent to complete reconsideration "and sign a final rule by December 1, 2026." *Id.* Although Petitioners would still be harmed by such a stay, temporarily staying the mandate would at least provide a real incentive for EPA to meet its self-imposed deadline. A temporary stay of the mandate provides a more legally sound way to prevent disruptive consequences than remand without vacatur, and doesn't require Petitioners to resort to the extraordinary remedy of "mandamus" should the agency ignore this Court's decision and blow past its aspirational deadlines. *In re Core Commc'ns, Inc.*, 531 F.3d at 862 (Griffith, J., concurring); *NRDC v. EPA*, 489 F.3d 1250, 1262–

64 (D.C. Cir. 2007) (Randolph, J., concurring) (recommending this practice).

## CONCLUSION

For the foregoing reasons, the Court should declare that EPA's Final Rule is unlawful and vacate 40 C.F.R. § 600.113-12(o)(1), which implements EPA's $R_a$ sensitivity factor.

February 19, 2025

Respectfully submitted,

/s/ James R. Conde
Michael Buschbacher
R. Trent McCotter
James R. Conde
  *Counsel of Record*
Laura B. Ruppalt*
BOYDEN GRAY PLLC
800 Connecticut Ave. NW,
Suite 900
Washington, DC 20006
(202) 955-0620
jconde@boydengray.com
*Counsel for Petitioners*

\* Admitted only in Virginia; practice limited to matters before federal agencies and federal courts.

# CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic service are being served today with a copy of this document via the Court's CM/ECF. All parties in this case are represented by counsel consenting to electronic service. The parties have also waived paper service pursuant to 5th Cir. R. 31.1.

February 19, 2025

Respectfully submitted,

/s/ James R. Conde
BOYDEN GRAY PLLC
800 Connecticut Ave. NW,
Suite 900
Washington, DC 20006
(202) 955-0620
*Counsel of Record for Petitioners*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and Fifth Circuit Rule 32.2 because it contains 6,499 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure Rule 32(a)(5)–(6) and Fifth Circuit Rule 32.1 because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook and 14-point font.

February 19, 2025

Respectfully submitted,

/s/ James R. Conde
BOYDEN GRAY PLLC
800 Connecticut Ave. NW,
Suite 900
Washington, DC 20006
(202) 955-0620
*Counsel of Record for Petitioners*